## Wytheville.

J. C. DAVIS, DIRECTOR GENERAL OF RAILROADS AND
AGENT UNDER SECTION 206 OF THE TRANSPOR-
TATION ACT OF 1920, v. E. S. MERRILL,
ADMINISTRATOR OF CLAUDIA HARRELL,
DECEASED.

June 15, 1922.

1. INSTRUCTIONS—*Partial View of the Evidence.*—An instruction that di-
rects a verdict for defendant on a partial view of the evidence is
properly refused.

2. MASTER AND SERVANT—*Action against Master for Tort of Servant—
Instruction Directing Verdict on Partial View of the Evidence—Case
at Bar.*—Plaintiff's intestate was shot by a gateman of defendant
railroad. There was evidence tending to support plaintiff's con-
tention that defendant was liable for its conduct in employing for
a gateman an unfit person. Therefore, an instruction that if the
jury believed from the evidence that the gateman's duties did not
authorize him to commit the act which resulted in the death of
plaintiff's intestate, but that it was his personal act, outside of
the scope of his duty, they must find for the defendant, would have
been improper as directing a verdict for defendant on a partial view
of the evidence.

3. INSTRUCTIONS—*Repetition.*—Where an instruction already given suf-
ficiently covers the law of the case, the refusal of another instruction
upon the point is not improper.

4. TORTS—*Liability in General.*—If a person, acting for himself, wilfully
and maliciously inflict an injury upon another he is liable in damages
for such injury.

5. MASTER AND SERVANT—*Assault and Battery—Liability of Master for
Assaults of Servants.*—It is manifestly right and just that both cor-
poration and individuals be required to answer in damages for
wanton and malicious assaults inflicted upon others by their servants,
while acting within the scope of the servants' employment and duty,
and it matters not whether the act of the servant is due to a lack of
judgment, the infirmity of temper, or the influence of passion or
that the servant goes beyond his strict line of duty and authority
in inflicting such injury; and the authorities so hold.

6. MASTER AND SERVANT—*Liability of Master for Assault by Servant—
Case at Bar.*—In the instant case, an action against defendant for

the killing of plaintiff's intestate by a gateman, the contention arose over the raising of the gates at a crossing at a late hour of the night, a matter admittedly within the scope of the gateman's employment and duty, and as an immediate result thereof, the gateman shot and killed deceased.

*Held:* That the two acts constituted parts of one and the same transaction, and that defendant was liable.

7. MASTER AND SERVANT—*Torts of Servant—Scope of Employment.*—In general terms, it may be said that an act is within the course of the employment if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account.

8. MASTER AND SERVANT—*Master's Liability for Torts of Servants—Scope of Employment—Test of Liability.*—The test of the liability of the master for the tortious act of the servant is not whether the tortious act itself is a transaction within the ordinary course of the business of the master, or within the scope of the servant's authority, but whether the service itself, in which the tortious act was done, was within the ordinary course of such business or within the scope of such authority.

9. MASTER AND SERVANT—*Torts of Servant—Responsibility of Master for the Employment of an Incompetent and Dangerous Person—Case at Bar.*—In the instant case an action against defendant railroad for the killing of plaintiff's intestate by a gateman of defendant, defendant, when it employed the gateman, knew, or could by the exercise of ordinary care have known, that he was an incompetent and dangerous person to be entrusted with such duties, and was therefore responsible for the employment of such an incompetent and dangerous person as gateman.

Error to a judgment of the Circuit Court of the city of Norfolk in an action of trespass on the case. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*F. M. Rivinus* and *Hughes, Little & Seawell,* for the plaintiff in error.

*H. R. Leary* and *Tazewell Taylor,* for the defendant in error.

WEST, J., delivered the opinion of the court.

The defendant in error, E. S. Merrill, administrator of Claudia Harrell, deceased, recovered a judgment against John Barton Payne, Director General of Railroads, the immediate predecessor of the plaintiff in error, J. C. Davis, Director General of Railroads and Agent under section 206 of the transportation act of 1920 (41 Stat. 461), in the Circuit Court of the city of Norfolk, for $10,000.00, with interest from November 18, 1920, and costs, for negligently and wrongfully causing the death of said Claudia Harrell. The case is here upon a writ of error to that judgment.

For convenience the parties will be designated as plaintiff and defendant, with respect to their positions in the trial court.

About one o'clock a. m. on October 11, 1919, the plaintiff's intestate, in company with several others in an automobile, was returning from Ocean Park to her home in Norfolk. When they arrived at the Norfolk and Western Railroad crossing on Brambleton avenue, they were stopped by the closed gates, although no train was approaching. After being called several times, the gateman, Branch A. Ford, came out of a near-by storehouse with a lantern in his hand. The chauffeur asked him to please raise the gates, to which he replied, "there is other crossings you can go over besides this one." The chauffeur told him he didn't have time to go all over town looking for crossings, when there was no train standing there and no train approaching. Ford then left, going towards the tower and started up, mumbling something the driver could not understand.

As soon as he entered the tower box he raised the gates and as the car was leaving the wood part of the crossing Ford fired three pistol shots at the rear of

the car, in quick succession, one of which struck Claudia Harrell in the back, giving her a wound from which she died shortly thereafter in a Norfolk hospital.

Ford was arrested a few hours later under a warrant charging him with murder. The officers who made the arrest and all other witnesses who saw him that night and next day, except J. T. Routten, testified that he talked and acted as a sane man, and that they saw nothing strange in his conduct. Routten thought he acted strange, and he appeared to him to be upset mentally.

On January 21, 1920, Ford was adjudged insane and committed to the Southwestern State Hospital for proper care and observation, with instructions to the superintendent to inform the Corporation Court of the city of Norfolk from time to time of his mental condition.

The defendant contends that the trial court erred:

1. In overruling the demurrer to the plaintiff's amended declaration.

2. In refusing to give a certain instruction asked for by the defendant.

3. In overruling defendant's motion to set aside the verdict of the jury and enter judgment for defendant.

The plaintiff rests the liability of the defendant on two grounds:

1. "That the killing of the plaintiff's intestate by the defendant's employee arose out of and was a part of a transaction between the plaintiff's intestate and the defendant company, in which the gateman, Ford, was acting for the defendant company, said transaction being within the scope of the gateman's employment. And

2. "That the defendant company was responsible for the employment of a servant of the character of

the gateman, when it not only knew by reason of its previous discharge of him, but might further have known by the exercise of ordinary care, that he was an incompetent and dangerous person to entrust with duties of the character in question.''

The first assignment of error will be considered along with the third assignment.

[1-3] (a) The instruction referred to in the second assignment of error reads as follows:

"If you believe from the evidence that Ford's duties as crossing watchman for the railroad did not require or authorize him to commit the act which resulted in Claudia Harrell's death, but that it was his personal act, outside of the scope of his duty, then you must find for the defendant.''

The court gave the following instruction as the only instruction in the case:

"If you believe from the evidence that Ford did not act within the scope of his authority and duty in committing the act which resulted in the death of Claudia Harrell, but outside of the scope of his authority, then you must find for the defendant.''

The instruction refused was properly refused for the reason that it directs a verdict for the defendant on a partial view of the evidence. There is evidence tending to support the plaintiff's contention that the defendant was liable for its conduct in employing for gateman a person whom it knew, or by the exercise of ordinary care ought to have known, was an unfit person for the position. Yet, under the instruction in question, even though the jury might have believed the defendant negligent in this respect, they would have been compelled to return a verdict against the plaintiff, if they were of the opinion that Ford's act was not required, or authorized by the defendant.

Besides, the instruction given, *supra*, sufficiently covered the law of the case.

There is no merit in this assignment.

[4, 5] (b) Was Ford acting within the scope of his employment when he fired the fatal shot?

If a person, acting for himself, wilfully and maliciously inflict an injury upon another, he is liable in damages for such injury. And there is no reason why a master should be permitted to turn his business over to servants who have no regard for the public welfare and thereby escape the responsibility which he would otherwise have to bear. It is manifestly right and just that both corporations and individuals be required to answer in damages for wanton and malicious assaults inflicted upon others by their servants, while acting within the scope of the servant's employment and duty, and it matters not whether the act of the servant is due to a lack of judgment, the infirmity of temper, or the influence of passion, or that the servant goes beyond his strict line of duty and authority in inflicting such injury; and the authorities so hold.

In *Railroad Co.* v. *Quigley*, 21 How. 202, 16 L. Ed. 73, it is held that, "for acts done by the agents of a corporation, either in *ex contractu* or *in delicto*, in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances."

In the case of *Richberger* v. *Am. Exp. Co.*, 73 Miss. 161, 18 So. 922, 31 L. R. A. 390, 55 Am. St. Rep. 522 (in which the plaintiff went to the office of the defendant to pay an overcharge on express matter and subsequently returned to have the overcharge refunded, and, immediately upon signing and delivering the receipt therefor, the defendant's servant cursed and insulted the plaintiff), the court says:

"It is impossible to say, on the allegations of this declaration, that the tort committed immediately upon the delivery of the receipt to the agent, and because of the demand for the refunding of what was plaintiff's conceded due, was so separated in time or logical sequence as not to have been an act done in the master's business. The whole transaction occurred in the shortest time, and was one continuous and unbroken occurrence. The cursing and abusing and maltreatment were all administered in connection with the taking of the receipt and, immediately upon its delivery, and because of the demand for his rights in that matter, and while plaintiff was in appellee's office to transact, and transacting this very business. What was said and done thus immediately upon the delivery of the receipt was part of the *res gestae.* \* \* \* \* \* \* \* \* \* The master who puts the servant in a place of trust or responsibility or commits to him the management of his business or care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty and authority and inflicts an unjustifiable injury upon another."

In *New Ellerslie Fishing Club* v. *Stewart,* 123 Ky. 13, 93 S. W. 600, 29 Ky. Law Rep. 416, 9 L. R. A. (N. S.), 477, the following language is used:

"It is difficult to define with accuracy the point at which the master's liability for the acts of his servant ends, but, under the facts of this case, Proctor, when he attempted to prevent appellee from fishing, and when the altercation between them commenced, was clearly acting within the scope of his employment, and the assault and battery complained of was merely

a continuation of the first act. There was no appreciable length of time between them. Everything that was done happened on the premises under the control of the fishing club, and where Proctor had authority as its agent. Where the agent begins a quarrel while acting within the scope of his agency, and immediately follows it up by a violent assault, the master will be liable, as the law under the circumstances will not undertake to say when, in the course of the assault, he ceased to act as agent and acted upon his own responsibility."

In *Wise* v. *C. & C. R. Co.*, 91 Ky. 537, 16 S. W. 351, the company was held liable for an assault by its conductor on a passenger committed on the street and after the passenger had left the car, the court holding that the altercation having commenced on the car, the assault was merely a continuance of the wrong.

To the same effect is *Fick* v. *Chicago Ry. Co.*, 68 Wis., 469, 32 N. W. 527, 60 Am. Rep. 878; *Maniaci* v. *Interurban Express Co.*, 266 Mo. 633, 182 S. W. 981; and *Haehl* v. *Wabash Ry. Co.*, 119 Mo. 325, 24 S. W. 737.

In the *Maniaci Case* the controversy between the plaintiff and defendant's servant arose over the signing of a receipt by the plaintiff, and resulted in the defendant's servant, without just cause, shooting the plaintiff. It was held that the act came within the scope of the servant's employment and the defendant company was held liable for the injury done to the plaintiff.

In the *Haehl Case* a watchman in charge of a railroad bridge shot and killed the plaintiff's intestate, who had no lawful right on the bridge, while he was retreating, and the appellate court sustained a judgment of the trial court in favor of the plaintiff.

In *Savannah Electric Co.* v. *Wheeler*, 128 Ga. 550, 58 S. C. 38, 10 L. R. A. (N. S.), 1176, a drunken conductor had a dispute with a passenger on the street car and firing a pistol at the passenger, missed him but struck and killed a passer-by on the public street, and the company was held liable for the death of the deceased.

[6] In the instant case the contention arose over the raising of the gates at a late hour of the night, a matter admittedly within the scope of the gateman's employment and duty, and as an immediate result thereof, the gateman shot and killed the deceased. The two acts constitute parts of one and the same transaction.

[7] In 2 Mechem on Agency (2nd ed.), section 1960, the author defines "scope of employment" as follows:

"In many cases, no better definition can be given than the words themselves suggest. But, in general terms, it may be said that an act is within the course of the employment if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account."

[8] Judge Sims, speaking for the court, in *Myers* v. *Lewis*, 121 Va. p. 71, 92 S. E. 988, after reviewing the authorities on the subject, says the test of the liability of the master for the tortious act of the servant, is not whether the tortious act itself is a transaction

within the ordinary course of the business of the master, or within the scope of the servant's authority, but whether the service itself, in which the tortious act was done, was within the ordinary course of such business or within the scope of such authority.

When the foregoing authorities are applied to the facts in the instant case, it is manifest that the defendant is liable for the act of its agent in inflicting the injuries complained of.

The parties in the automobile had no communication with the gateman, personally, but only as the servant of the defendant.

The gates were closed when plaintiff's intestate arrived. It was the duty of Ford to open and close them. Incensed by the request that he raise the gates at that hour of the night, as he climbed into the tower he became angry, and, immediately upon raising the gates, began firing at the parties before their automobile had cleared the right of way of the defendant. Ford was charged primarily with the duty of protecting the traveling public from the passing trains of the defendant, but this duty carried with it the obligation not to injure them himself.

[9] (c) Was the defendant responsible for the employment of an incompetent and dangerous person for gateman, when it employed Ford, and did it know, or could it by the exercise of ordinary care have known that he was an incompetent and dangerous person to be entrusted with such duties?

The plaintiff rests his contention that Ford was a dangerous and improper person to be employed for the position of gateman, on three reasons:

1. Because he was discharged from the operating department of the Norfolk and Western many years ago for drunkenness, and for a number of years, im-

mediately preceding the adoption of State-wide prohibition in Virginia, was widely known in police circles in Norfolk as a common drunkard.

2. Because of a form of insanity superinduced by persistent drunkenness.

3. Because he was easily incensed and would get into a tantrum or become dangerously angry on slight provocation.

We think it has been sufficiently shown, *supra*, that, whether Ford's homicidal act was due to drunkenness, ungovernable temper, or malice, he was at the time of its commission engaged in a service which was within the scope of his employment.

There is no evidence tending to show that Ford was drunk on the fatal night, nor that his mental condition was abnormal, except the testimony of witness J. T. Routten, who saw him the next day. Lambert, who was driving the automobile, testified that prior to the shooting there was nothing to make him think Ford was crazy, and later in the night when he saw him in the police station, there was nothing to indicate insanity, as "he was just like any ordinary looking man." Boggs, the police officer who arrested Ford the night of the homicide, found him at his post of duty in the tower and testified that Ford talked sanely and looked like a sane man to him.

The allegations contained in the plaintiff's reason No. 1, *supra*, touching drunkenness, are admitted to be true. And there is ample evidence tending to prove that Ford was a man who would become highly incensed over a very simple matter and get dangerously angry from slight provocation. Witness Routten, who has known him for several years, testified that on one occasion witness was putting up a desk and simply asked Ford to put a screw in it, and he got very mad

and grabbed his hat and went out like he was mad enough to kill Routten. Routten says he would have "spells."

The record shows that Ford was employed by W. R. Crawley, who had charge of all the defendant's watchmen around Norfolk, upon the recommendation of S. A. Coleman, who held a position as watchman with the Norfolk and Western, and made no inquiry of anyone else concerning Ford's past record, habits or general fitness for the position. Had he looked up his record with the Norfolk and Western showing his discharge for drunkenness, and made some inquiry of the members of the police force at Norfolk, he would probably not have given him the position.

In *Williams* v. *Mo. Pacific Ry. Co.*, 109 Mo. 475, 18 S. W. 1098, the court said:

"The real question here is whether there is evidence to support the finding of the jury. According to the plaintiff's witnesses, Clark was an habitual drinker, often drunk when off and sometimes when on duty, and was seldom free from the influence of liquor. From these facts, the jury had a right to draw the inference that Clark was an unfit person to be intrusted with the responsible duties of a locomotive engineer, even in his sober intervals. The evidence shows that it requires a man of steady nerve, cautious and not forgetful, to discharge such duties. That these elements of physical and mental strength will and do yield and give way from continued intemperate habits, is but common information. Besides this, all of the defendant's witnesses who testify upon the subject say that a man having the habits which the plaintiff's witnesses say Clark had, should not be put in charge of a locomotive engine. It requires no temperance lecture to satisfy the mind of anyone that there is an

abundance of evidence to uphold and support the verdict on this issue."

In *Christian* v. *Columbus R. Co.*, 79 Ga. 460, 7 S. E. 216, we find this:

"But this declaration alleges that the railroad company employed him knowing his infirmity; and that, of course, subjects the company to the consequences, if it be true. Their employment of an improper person to come in contact with the public as their agent would be gross misconduct."

It follows that the first and third assignments of error are likewise without merit.

For the foregoing reasons, we are of the opinion that there is ample evidence to support the verdict of the jury and that the judgment complained of is plainly right and should be affirmed.

*Affirmed.*