# Wytheville

## THE CHESAPEAKE AND OHIO RAILWAY COMPANY V. J. L. GOLLADAY.

June 13, 1935.

Present, Holt, Epes, Gregory, Browning, and Chinn, JJ.

The opinion states the case.

*J. M. Perry,* for the plaintiff in error.

*Thomas J. Wilson, Jr.,* and *J. W. C. Johnson,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

This is an action for damages for injuries sustained by the plaintiff, J. L. Golladay, while in the employ of the defendant, the Chesapeake and Ohio Railway Company.

The plaintiff alleged negligence on the part of the defendant in that it failed to keep and maintain a certain machine, which it owned and operated, in a reasonably safe state of repair but allowed the same to become defective and become and remain in an unsafe condition, which condition was known, or by the exercise of reasonable care should have been known to the defendant and further that the defendant negligently and carelessly operated the said machine, which negligent acts and omissions caused the injury complained of.

The defendant denied that it was guilty of any negligence and urged as matter of defense that the plaintiff was, at the time he was injured, acting without the scope of his authority, and in violation of its rules and instructions and that his injury was caused by his own negligence; that at the time of his injury he was doing work which he should not have done and he was where he had no business to be, in short, he was the author of his own misfortune.

The issues were made up and a trial was had which resulted in a verdict for the plaintiff for five thousand dollars which, on a motion to set aside, was sustained by the trial court. There is no question pertaining to instructions as none were asked by either litigant which became a part of the record.

The record consists in the main of a mass of testimony containing many objections to its admissibility, the arguments of counsel and the rulings of the court, covering, with the petition and pleadings, some four hundred pages. Out of this mass we have deduced the following facts, which we think are the most important ones to our inquiry.

On February 24, 1931, the plaintiff sustained an injury which resulted in the loss of his left eye. He was twenty-four years of age and was an electrician apprentice and as such had been in the employ of the defendant for a year and nine months.

The defendant maintains and operates in the city of Clifton Forge, Virginia, extensive work shops in which a variety of work is done incident to its operation as a railroad. This

plant includes many units which are physically and operatively separate, such as the blacksmith shop, boilermakers' shop, electricians' shop, etc. The workmen and mechanics in each are more or less skilled in the particular craft or trade to which they belong, and, apparently, according to the length of service, experience and skill, are ranked or graded as helpers, apprentices and finished mechanics and foremen.

In this case we are concerned particularly with the blacksmith shop and the electricians' shop. The former was under the supervision and the direction of R. L. Woodrum, who was the foreman; the latter was under like control of M. E. Diebert, who was its foreman. T. J. Topping was the general foreman who had general shop supervision. The blacksmith shop and its force of workmen occupied a large building, one hundred by one hundred and twenty-five feet, and was equipped with the various appliances incident to its work, consisting in part of forges, furnaces, ovens and heavy machinery, and particularly what was called a "punch and shears machine." This machine, which was ten tons in weight, was constructed with two opposite ends—one was the shears end for cutting metals and the other was the punch end used for punching holes in metals. They were operated independently of each other. The punching end was equipped, for its work, with a steel punch, which in this case was a fraction less than an inch in diameter; a die, which is a cylindrical piece of steel, with an orifice or cavity, which, of necessity, was a fraction of an inch less in diameter than the punch, for the punch, in order to properly function, had to penetrate this orifice to the extent of one-sixteenth of an inch; the orifice, however, extends entirely through the die, to provide a receptacle for the pieces or particles of metal punched out; a die holder which is another piece of circular steel with a cavity of sufficient diameter to hold the die, which sat therein. The die holder rested in steel bushings and the whole group was incased in a casting which was bolted to the machine. These parts, not including the punch, of course, are all held firmly in place by

what is called a "set screw" which passes laterally through the casting, the bushings and the die holder and presses against the die, which pressure is designed to hold the die rigidly in place, which must be, else the work of the punch may be. precipitately interrupted by a number of untoward happenings, such as pulling out the die or forcing it at an angle which is called by the witnesses, "cocking it," with the probability of such an accident as is here disclosed, for the initial and successive strokes of the punch are vertical, and descending must find the die perfectly in place so as to accomplish its entrance, through the substance being punched, into the die. If the punch and the die are out of approximately perfect alignment it is easily seen that some sort of mishap is bound to occur. The piece of metal or plate through which holes were being punched was one-eighth of an inch thick. The machine is operated by electricity which is applied by a motor switch and the operation is by either a hand lever or a pedal; the latter was in use at the time of the accident in the present case. The parts of the machine which we have described here were in evidence. The die was broken into three pieces and the punch showed that a small piece of its end had been chipped or broken off. The bottom of the die holder was worn to some extent so that the die did not rest in it on level but was tilted slightly. The threads of the set screw were somewhat worn as was the case with the threads in the die holder where the screw penetrated it.

On the day of the accident the plaintiff was directed by his foreman, Mr. Diebert, to go to the car shop and complete what he called "a conduit job." A conduit is a metal pipe in which electric wires are enclosed. It is necessary to connect the conduit with a switch box, and to hold it in place a metal plate called a "switch plate" was used with a hole in it sufficiently large for the conduit to extend through it. The plaintiff secured a piece of metal for the plate and went to the blacksmith shop to have the hole drilled through it. He was accompanied by Mr. Koontz, as a helper, who was employed by the defendant as an electrician helper.

The plaintiff requested Mr. Spangler to drill the hole in the plate which Spangler declined to do because the piece of metal was too thin to be drilled and stating that it should be done by punching a number of intersecting holes with the punching machine until a hole of the required size was obtained. Spangler was a blacksmith helper of some fourteen years experience and was in charge of the punching machine. The three men, Spangler, Golladay and Koontz, in one way or another, began busying themselves with the proposed operation. Spangler had told the plaintiff to punch the holes in the plate, which he declined to do. Then he assisted Spangler and at the latter's direction sat in the operator's seat and held the plate. The punching machine had been in continuous use in the defendant's shop for a period of ten to twelve years without repair except to the clutches, and the die holder was the one which originally came with the machine. During the progress of the work the die pulled out with the punch and it became necessary for Spangler to halt the operation and adjust and tighten the set screw twice and as the third attempt was made to complete the work, the die became cocked and on the downward stroke of the punch the accident happened, resulting in the injury to the plaintiff. An X-ray examination revealed a metallic body in the plaintiff's left eye, about the size of the surgeon's little finger nail, which necessitated the removal of the eye-ball.

The plaintiff had never operated nor assisted in the operation of the punching machine before nor was he familiar with its mechanism.

The occasion of the plaintiff being sent to do this particular piece of electrical work was to relieve Mr. Robinson, an electrician, who began it and he instructed the plaintiff how to complete it.

The defendant urges four assignments of error. The fourth is based on the ruling of the trial court in refusing to set aside the verdict of the jury upon the grounds set forth in the motion, which are as follows:

(1) "That the verdict is contrary to the law and evidence and is without evidence to support it;

(2) "That the plaintiff, in working or assisting at the punching machine, was not acting within the scope of his employment or under any directions or requirement thereto on the part of the defendant;

(3) "That the blacksmith helper, Spangler, was without authority from the defendant to direct the plaintiff to work at the punching machine, or to assist in the work at the machine, or to assist Spangler, a blacksmith helper."

The determination of the questions involved in these grounds is, in our opinon, controlling as to the real issues in the case.

The learned judge of the trial court delivered an able opinion in the case which is made a part of the record. We quote from it as follows:

"So far as the record shows, there are no printed rules promulgated by the defendant primarily for the safety of the employees, except in so far as the printed rules embraced in the union contract between the defendant and the various shop crafts can be so interpreted. It would seem that such contract is intended primarily to divide up the shop work, so that one workman will not infringe upon the working rights of his fellow-worker. The plaintiff was not a member of any union. The printed rules embraced in the contract between the union and the defendant in reference to the duties of electrician apprentices do not specify what an electrician apprentice shall, and shall not do, and the plaintiff had never been given any instructions as to what were the so-called rules claimed to have been established by custom or practice in the defendant's shops at Clifton Forge."

"Any alleged rule prohibiting the plaintiff's assisting Mr. Spangler in the operation of the punching machine must have as its basis the 'custom' and 'practice' in the shops— it could rest on nothing else, and as to the alleged custom or practice there is a more serious conflict in the evidence * * *."

"The plaintiff and certain of his witnesses testified that under the custom and practice at the shops it was customary for apprentices, including electrician apprentices, when they had a small job to be done in another department, to take that job, without any order from their own foreman so to do, direct to the workman in that other department in charge of the machine at which the work was to be done, and if that workman requested assistance from the employee bringing in the work, it was the duty and the custom of the latter to assist in that work. In other words, the testimony of the plaintiff and certain of his witnesses was that in taking the switch plate from the car department, where the plaintiff was working, direct to Mr. Spangler, in charge of the punching machine, and at Mr. Spangler's request, assisting him in the operation of the punching machine, was not only in accordance with the plaintiff's duties, but also in accordance with the established custom and practice of all apprentices in the various shops, including electrician apprentices."

■■ The testimony of certain of the defendant's witnesses was in sharp conflict with those of the plaintiff as to the existence of the usage and custom referred to. This of course makes it essentially a matter for the jury and its verdict is binding upon this court in the circumstances. The verdict of the jury comes to us smartly strengthened by the judgment of the court sustaining it. If there were a rule prohibiting electrician apprentices from assisting in working at the punching machine, it was, in our opinion waived by the defendant, by its habit of acquiescing in its transgression.

That this is true depends not alone on the testimony offered by the plaintiff but that of the defendant, in part, sustains this view.

The witness, P. E. Koontz, an electrician helper, who was assisting Spangler and the plaintiff in the work at the punching machine, and who was called by the defendant, testified as follows:

"Q. I will ask this question. You stated that you have

assisted at the punching machine in the blacksmith shop. I wish you would state what your position or place was in the electrical department?

"A. Electrician helper was my position.

"Q. Had you been doing that prior to the time of this accident?

"A. Yes, sir, I had done it on different occasions.

"Q. I wish you would state whether or not it is the general practice or custom with an electrician apprentice, or one of a lower grade as for instance, an electrician helper, goes from the electrical department to the blacksmith shop for work to be done on the punching machine in the blacksmith shop, to assist the man operating the punching machine if he requests you to do so?

"By Mr. Perry: I object to the question because the witness has not been shown to be in a position to testify as to this habit or custom, and again on the ground that we have heretofore stated in regard to objections to other questions of like character.

"Objection overruled. Defendant excepts.

"A. Yes, sir."

It is true that the plaintiff testified that it was not his duty to punch the hole in the plate but to get some one either to drill or punch it for him and that if he had seen Mr. Woodrum he would have told him what he wanted and that he thought he (Woodrum) would have assigned some one to do the work. He also testified that he did not know the mechanism of the machine and that he had never worked at it before nor assisted in working it. He again testified that when Spangler told him to do the punching he declined with the declaration that he was afraid that if Mr. Woodrum caught him over there he would give him the devil and that Spangler replied if he would get behind a certain machine Mr. Woodrum could not see him and they would then punch the hole. Viewing this testimony alone and unqualified by any other, its effect is decidedly hurtful to the plaintiff's case, but there is other evidence which must be weighed and considered, which deprives it of the force which the defend-

ant's counsel attaches to it. It must be kept in mind that the plaintiff, by order of his foreman, was detailed to take the place of an electrician and complete the conduit job. It is patent from the testimony and from common knowledge that the conduit not connected with the switch box would not present a completed electrical job. It was necessary to have the plate with the hole in it for the conduit pipe in order to make the switch box connection. The plaintiff looked in the window of the office of the blacksmith foreman, Woodrum, for the manifest purpose of securing his aid in the work to be done. Woodrum was out and then he did what one might easily or reasonably expect—the natural thing to do. He went to Spangler, who was in charge of the drill and the punching machine, and sought his help. He had what was deemed a small job and in pursuing the alternative course, which he adopted, he was but doing what those of his own craft and those of other crafts had done many times before, and which had ripened into a usage or custom with the apparent knowledge and acquiescence of the defendant. In all probability there was involved in the act a pardonable pride in completing the mission he was given on this his natal day as an electrician. It will be remembered that by order of his superior officer, M. E. Deibert, foreman, he was doing the work of an electrician whom he relieved.

Now what was the testimony of this officer, who was another witness called by the defendant? The witness was interrogated on cross-examination as follows:

"Q. Didn't you just say you told him to go and complete the conduit?

"A. To complete the conduit.

"Q. Was Mr. Robinson working on just the conduit or was he supposed to complete the job, or what?

"A. They were working under my instructions.

"Q. And was this switch plate to be used in the conduit?

"A. No, sir, it was the plate where the conduit terminates into the switch box.

"Q. You claim now that you went over there and told

Golladay, now I want you just to complete this conduit here, where the pipe runs to and don't go beyond that, is that what you told him?

"A. No, sir.

"Q. What did you tell him?

"A. I told him to put in the conduit.

"Q. Wouldn't it reasonably follow if he was working on the conduit that he would go ahead and work on the switch plate too?

"A. Not necessarily.

"Q. Wouldn't it permit now under the circumstances of Mr. Golladay's work for him to attempt to make the switch plate?

"A. I will answer that this way, if I may, that was a part of the work of Golladay, it was all right for him to go ahead and fix that, but he didn't have to unless he came back to me for instructions.

"Q. But it was part of the work and it was all right for him to go ahead and do it?

"A. Yes, sir."

The defendant would parry the effect of this testimony by the contention that its significance is limited to the inquiry, whether or not it was part of the plaintiff's duty to work on the switch box at all but its interpretation of the effect of the testimony, in our opinion, is not justified by the text. The witness was asked if it was all right for the plaintiff "to attempt to make the switch plate," and he answered, "It was all right for him to go ahead and fix that, but he didn't have to unless he came back to me for instructions," then to the question, "But it was a part of the work and it was all right for him to go ahead and do it," he answered, "Yes, sir."

Of course the method to be employed in doing it, was to be determined, and naturally by the plaintiff, for the job was committed to him.

The same witness again testified on cross-examination:

"Q. Isn't it a fact that it is a time saver for a man in the course of a job, if they have a small job in another depart-

ment that won't require but a very few minutes time of the man in the other department, for a man, say in the electrical department, just to go over to the desired department where he can get the work done and get it done and get quickly back on his job, and don't the men up there do that frequently as a matter of fact?

"By Mr. Perry: I object to this evidence, and all questions of like character.

"By the court: Are you including work on the punching machine?

"By Mr. Wilson: Yes, including work on the punching machine in the blacksmith shop?

"A. Yes, sir, it saves time.

"Q. And the men do it?

"A. Not my men.

"Q. And you foremen know they do it even though it is not in accordance with the printed regulations?

"A. I stated previously it has been done.

"Q. When you say 'it has been done,' do you mean just one isolated case having been done say five years ago, or do you mean to say it is a thing that is done from time to time by the men there?

"A. It is done from time to time.

"Q. And you foremen know that?

"A. We know that it is not the practice, but it is done from time to time as I have previously stated."

The decided weight of the testimony was that it was the custom and practice for helpers and apprentices, including the electrical apprentices, with small jobs to be done, to take them to the appropriate shop, and have the work done, and to assist in doing it, if asked to do so.

There was much testimony tending to prove that Spangler was in charge of the punching machine and operated it, indeed, he was seen operating it on the day in question, in an instance distinct from that in which the accident was involved. One witness of years of experience in defendant's shops testified that he had never seen any one operate it except Spangler.

It was also in evidence that Spangler's rank, which was that of blacksmith helper, did not denote his qualifications. He had worked in the shop some ten years but under certain rules he was too old to be promoted regardless of his eligibility otherwise. It is significant to note that personally the testimony of no one could have shed more light upon every major issue here presented than that of Spangler, yet he was not called by the defendant despite its avowal that it would call him as a witness. We must assume that had he been called his testimony would have been inimical to the defendant's contentions. *Metropolitan Life Ins. Co.* v. *Botto,* 153 Va. 468, 143 S. E. 625, 154 S. E. 603; *U-Run-It Co.* v. *Merryman,* 154 Va. 467, 153 S. E. 664; *East Line & R. R. R. Co.* v. *Scott,* 68 Tex. 694, 5 S. W. 501.

*Ambrosio* v. *Boston, etc., R. Co.,* 81 N. H. 119, 124 A. 551: "The test to determine whether the plaintiff was acting within the scope of his employment when he was injured is not to inquire whether he was told in so many words to do the act in question, but whether the defendants ought to have anticipated that such a man might do it."

*Louisville, etc., R. Co.* v. *Hays' Adm'r* (Ky.) 128 S. W. 289, 291: "Much less uniformity of observance or certainty and fixedness of character in a usage would be required in the case of a servant to prevent his being regarded as a volunteer than would be required in the case of a carrier where a custom was relied on to shield it from its common-law liability. In the case of the servant the question would be simply were the circumstances such as to justify a man of ordinary prudence in regarding the thing as a part of his duty."

We may fairly say that the plaintiff, in saying it was not his duty to make the hole in the switch plate, did not mean that it was not his duty to have it made and to assist in making it, if the man whose duty it was, asked him to do so. This is made plain by his subsequent testimony.

"But the scope of a servant's duties is to be defined by what he was employed to perform, and by what, with knowledge and approval of his master, he actually did per-

form, rather than by the mere verbal designation of his position. Where it is shown that the servants were in the habit of exchanging work or assisting each other in their duties, a servant so engaged is held to be still within the scope of his employment * * *." *Corpus Juris,* vol. 39, section 403, pages 278, 279.

See *Davis* v. *Merrill,* 133 Va. 69, 112 S. E. 628, 630, for an exposition of this court's comprehension of the meaning of the doctrine, "within the scope of the servant's authority."

There is evidence, both in the form of testimony and in the observable condition of the parts of the punching machine, which tends to prove a defective condition of certain parts of the machine.

All of the questions we have considered are, where there is a conflict of evidence, for the determination of the jury. This is so as to the liability of the defendant under the fellow servant doctrine which is raised by the defendant. *So. Ry. Co.* v. *Newton's Adm'r,* 108 Va. 114, 60 S. E. 625.

It has been repeatedly said by this court that in actions founded on negligence, "whenever the facts are in dispute or conflicting, or the credibility of witnesses is involved, or the preponderance of evidence, or whether the facts admitted or not denied are such that fair-minded men might draw different inferences from them, it is a case for the jury, and a case should not be withdrawn from the jury unless the inferences from the facts are so plain as to be a legal conclusion—so plain that a verdict for the plaintiff would have to be set aside as one rendered through prejudice, passion or caprice." *Digest of Va. and W. Va. Reports* (Michie) vol. 7, page 161, and cases there cited.

The defendant also alleges error in the action of the court, in permitting the plaintiff and the plaintiff's witness, Cunningham, to testify, over defendant's objection, that a practice prevailed in the defendant's blacksmith shop, applicable to all employees of the other shops, for them to help the operator of any machine, including the punching machine, in work they took there to be done, if asked to assist by the operator of the machine.

We think the experience of each of the witnesses and their length of service and their means of knowledge and powers of observation rendered them competent to testify as to such fact and that the elicited fact was both material and relevant.

The second assignment of error is based upon the action of the court in permitting the defendant's witness, R. L. Woodrum, foreman of the blacksmith shop, to be asked on cross-examination whether or not five or six weeks after the accident he had directed Spangler to do some work on the punching machine which was brought into the shop by M. L. O'Brien, an employee of the defendant, and who was formerly an electrician, and, upon the denial of this by Woodrum, O'Brien was allowed to testify that such was the case. The objection of the defendant was that the matter elicited was immaterial and irrelevant and that it was not permissible to bring in a collateral matter and then contradict the witness upon that matter.

The plaintiff replied by pointing out the fact that Woodrum had testified in direct examination that in all of his years of experience he had never directed nor allowed Spangler to work at the punching machine and that he cited a rule which allegedly forbade such work upon Spangler's part and he was emphatic in asserting his observance of the rule. The defendant's case was largely built around the contention that Spangler was without any authority to operate the punching machine. It was conceded that the evidence was not material as to the actual injury to the plaintiff on the day of its occurrence but in the light of the suggestion above referred to it was urged that it became material as to whether the rule was universally enforced by the defendant as bearing upon Spangler's authority to operate the machine. The trial court limited the effect of this testimony to its contradiction of the witness, Woodrum, and to his credibility as a witness.

█ █ We think the evidence was legal, certainly in the limited sphere of its admission, and probably as substantive evidence upon a major issue, as expressed in Jones on Evidence:

"But when there is such logical connection between the fact offered as evidence and the issuable fact that the proof of the former tends to make the latter more probable or improbable, the testimony proposed is relevant, if not too remote. The competency of a collateral fact to be used as a basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry or to assist, though remotely, to a determination probably founded on truth."

The third assignment of error is founded upon an alleged variance between the *allegata* and *probata*. We think the allegations of the declaration are sufficiently definite and inclusive to correspond with the proof.

The defendant in its reply brief stresses its contention as to the applicability of rule 113 to Spangler's right or authority to operate the punching machine.

This rule is:

"Helpers' work shall consist of helping blacksmiths, and apprentices, heating, operating steel hammers, punches and shears (cutting only bar stock and scrap), drill presses and bolt cutters; straightening old bolts and rods, cold; building fires; lighting furnaces, and all other work properly recognized as blacksmith helpers' work."

Clearly blacksmith helpers are authorized to operate both the punch and shears, the use of the latter being limited to cutting "bar stock and scrap." The word "cutting" could have no reference to the punches.

But the evidence is overwhelming that the rule was not enforced, even if its effect were as the defendant contends. Spangler was constantly operating it and this was after the defendant had dispensed with the services of a special or regular man to work it.

M. L. O'Brien, a witness who was in the employ of the defendant at the time of the accident and had been in its employ for ten years prior thereto, was asked:

"Q. Do you recall or do you know who had been operat-

ing the punching machine in the blacksmith shop at the time Golladay was injured or about that time, and sometime prior to that?

"A. When I first went there they had a regular man to operate that machine, but after that they would get in a blacksmith to operate it, and at times they would allow the helper, Mr. Spangler, to operate it."

We affirm the judgment of the trial court.

*Affirmed.*

HOLT, J., dissenting.

I am unable to concur in the judgment reached in this case. Golladay was not acting within the scope of his employment, and this he knew.

On the day of the accident he was sent by his foreman, Diebert, who was foreman of the electric shop, in which Golladay was an apprentice, to the blacksmith shop, that he might have a hole cut into an iron plate through which Diebert desired to pass an electric conduit. In accordance with his instructions he went to this blacksmith shop, and of course went to see its foreman, Mr. Woodrum.

Golladay himself then tells us what occurred:

"A. Well, I went to the blacksmith shop and went by the office of Mr. Woodrum, and looked in the window and Mr. Woodrum wasn't there. I went on in and went to Mr. Spangler, who has charge of the punching machine and drill press, I think they call it the bolt press, and I asked Mr. Spangler if he would drill this hole—I had it marked off, and he told me the iron was too thin to drill and to punch it. I told him I was afraid if Mr. Woodrum caught me over there he would give me the devil, and he said if you get behind that machine there, Mr. Woodrum can't see you and we will punch it, so Mr. Spangler goes around in front of the punching machine, * * *."

He first demurred to this suggestion that he aid in punching the plate. Later he acquiesced, did assist, and was hurt. He was asked if he had ever had any experience

with this punching machine, and answered, "I never had any experience." He was asked if he had ever done any work before this on a machine in the blacksmith shop, and answered, "I haven't done any particular work on a machine in the blacksmith shop." He furthermore tells us, "I did not have instructions from my foreman, or from blacksmith foreman Woodrum to punch this hole in the iron plate."

From this it appears that the plaintiff went to the blacksmith shop, as he was told to do, and went to see Woodrum, the foreman. Woodrum was not in, he then saw Spangler, who was himself an apprentice, and was by Spangler induced to assist in the work desired. But he knew that this was out of his line and said so. I think it entirely plain that he was knowingly undertaking something out of the scope of his employment, and since he did know it and knew that he was doing wrong, it is beside the point to say that other apprentices did the same thing.