**Connie M. JAMISON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 90–0141–A.

United States District Court, W.D. Virginia, Abingdon Division.

April 30, 1992.

As Corrected May 4, 1992.

Donald W. Huffman, Kenneth J. Lasky, Bird, Kinder & Huffman, Roanoke, Va., for plaintiff.

Mark M. Lawson, Steven R. Minor, Bristol, Va., for defendant.

## CORRECTED MEMORANDUM OPINION

SAMUEL GRAYSON WILSON, District Judge.

Connie M. Jamison ("Jamison"), plaintiff, brought this action in the Circuit Court of Tazewell County, Virginia, against Jerry Wiley ("Wiley"), her former supervisor in the Mine Safety and Health Administration Office in Richlands, Virginia. According to Jamison's Motion for Judgment, Wiley made "unwanted sexual advances" toward her, including, but not limited to "touching [her] private parts ..., smoking in her presence despite her allergy to smoke, listening in on [her] personal telephone conversations, criticizing [her] unjustly and following [her] around town when she was on her own time." The Attorney General

---

of the United States certified that it had been "determined that the events giving rise to this action occurred within the scope of federal employment." The action was removed to this court pursuant to 28 U.S.C. § 1442, and the United States was substituted as defendant pursuant to 28 U.S.C. §§ 2679(b)(1) and (2). Jamison moved for reconsideration of the order of substitution on the ground that Wiley was not acting within the scope of his employment. The United States moved to dismiss on various grounds, including Jamison's failure to file an administrative claim as required by 28 U.S.C. § 2875(a), as well as her recovery of benefits under the Federal Employee Compensation Act ("FECA"), 5 U.S.C. §§ 8101–8193. Concluding that it improvidently permitted substitution, the court vacated its order of substitution, denied the United States' motion to dismiss, and held an evidentiary hearing on the question of whether Wiley was acting within the scope of his employment. Recently, the Attorney General withdrew certification pursuant to 28 C.F.R. § 15.3. The court now finds that the acts at issue were not within the scope of Wiley's employment, that the withdrawal of certification was appropriate, and that the case should be remanded to the state court.

## I.

Jamison testified that on several occasions at the office, Wiley grabbed at her bra strap and even successfully unhooked it on one occasion. On another occasion, according to Jamison, Wiley walked by her desk, lifted up her skirt, and stuck his hand under her skirt. Jamison testified that on other occasions at the office, Wiley grabbed her breast and attempted to rub her leg. She testified that she consistently rejected his advances, and that he retaliated by blowing cigarette smoke in her face, by following her while she was off-duty, and by other harassing conduct.

Although Wiley denied some of the incidents, his own testimony demonstrated clearly inappropriate behavior:

Q: ... you've heard her testify about your lifting her skirt and putting your hand up her skirt; did you do that?

A: I possibly could have. Yes sir.

Q: You also heard her testify about you grabbing her breast; did you do that?

A: No, sir.

Q: You've heard her testify that you lifted up her sweater and put your hand up under her sweater in front of her, in her front; did you do that?

A: As I recollect, she had something like a midi-blouse on, not a sweater and as I walked by I ran my finger vertically across her stomach. It was about that much of her stomach showing.

Q: Okay. And you're saying that you didn't put your hand under it; is that what—

A: That's exactly what I'm saying.

Q: Did you ever snap her bra?

A: Yes, sir.

Q: Is she the only person you ever did that to?

A: No, sir.

Q: You did that to other employees?

A: Yes, sir.

. . . .

Q: Did you ever blow smoke in her face?

A: Probably.

Q: Get up right in front of her and deliberately do that?

A: Not two inches from her face, sir, maybe two foot from her face and blow smoke at her. Possibly I've done that. Yes.

Q: Why did you do that?

A: It was part of the game we played, sir.

(Tr. 52–55). Wiley further explained the "game" they allegedly played as follows:

I have nothing else to call it except say it was a game we played, just like I would blow smoke at Connie. As I walked by her desk I would drop an ash on her desk. When I went out to the mines she would collect every ashtray in the build-

ing, come in there and dump them on my desk. That was also part of the game. It was no big thing; it was just something that was done. What she described as sexual harassment, the things that I did, was just like her grabbing me by the rear end, which she did on several occasions in front of several people. It was just part of the game. (Tr. 55). According to Wiley, that "game" included Jamison modeling a bathing suit at the office.

## II.

To determine whether Wiley acted within the scope of his employment, the court must look to Virginia's rules of *respondeat superior*. *See White v. Hardy*, 678 F.2d 485, 487 (4th Cir.1982). Under Virginia's rules, an act is within the scope of employment if:

> (1) it be something fairly and naturally incident to the business, and (2) if it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account.

*Sayles v. Piccadilly Cafeterias Inc.*, 242 Va. 328, 332, 410 S.E.2d 632, 634 (1991) (citing *Tri-State Coach Corp. v. Walsh*, 188 Va. 299, 307, 49 S.E.2d 363, 367 (1948); *Davis v. Merrill*, 133 Va. 69, 77, 112 S.E. 628, 630–31 (1922)).

Obviously, the conduct complained of was neither "fairly and naturally incident to the business" nor incident to an "attempt to perform the master's business." If it were, in the words of the First Circuit, "[i]t would be an unusual job, to say the least...." *Wood v. United States*, 956 F.2d 7, 12 (1st Cir.1992). Rather, the acts resulted wholly from Wiley's "external, independent, and personal motive...." Wi-

ley strenuously argues, however, that many of the acts complained of occurred within the scope of his employment, and that "if Jamison's argument is taken to its logical conclusion, there will never be a case in which the United States is substituted for a federal supervisor if plaintiff alleges the supervisor criticized, disciplined, or took any employment action against plaintiff as 'retaliation' for rejecting a proposition." Wiley, in effect, contends that remand to the state court would imperil the "chief aim" of the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("Westfall Act"), 28 U.S.C. §§ 2671–2680 (Supp.1991), "to restore and protect federal employees' immunity." *Nasuti v. Scannell*, 906 F.2d 802, 808 (1st Cir.1990). The court disagrees. Contrary to Wiley's assertion that the court would circumvent absolute immunity by relying upon Jamison's mere allegations, the court has conducted an evidentiary hearing and made the factual finding from the sorry facts presented that Wiley's conduct was not within the scope of his employment.[1]

## III.

For the reasons stated above, this action will be remanded to the Circuit Court of Tazewell County, Virginia.

---

1. Wiley has failed to address, and the court does not reach, other issues raised by the court's memorandum opinion of August 16, 1991.