**Stephen Paul SIMMONS, Plaintiff,**

v.

**BALTIMORE ORIOLES, INC., et al., Defendants.**

Civ. A. No. 88–0211–A.

United States District Court,
W.D. Virginia,
Abingdon Division.

April 20, 1989.

Wendal Jackson, Bristol, Tenn., David Burton, Princeton, W.Va., and Gray Robinson, Bristol, Va., for plaintiff.

C. Adrian White, Bristol, Va., and Wade T. Watson, Bluefield, W.Va., for Champ and Hicks.

Howard C. McElroy, Abingdon, Va., for Orioles.

R. Wayne Austin, Abingdon, Va., for Bluestone.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

The plaintiff brought suit against the defendants for $1,000,000 in compensatory damages and $1,000,000 in punitive damages for injuries to his face and jaw arising out of a fight with defendants Champ and Hicks, minor league baseball players employed by the Baltimore Orioles. Specifically, Simmons alleges that he was the victim of an assault by Champ and Hicks which ended with Hicks breaking Simmons' jaw with a baseball bat. Defendant Balti-

more Orioles, Inc., has moved to dismiss the charges, and defendant Bluestone Security Agency has filed a motion for summary judgment. No motions are pending on behalf of Champ and Hicks individually.

Certain facts are not in dispute. Simmons, along with a friend, attended the Fourth of July, 1988 game between the Martinsville Phillies and the Bluefield Orioles, a Baltimore farm team, at Bluefield, Virginia. Bluefield was not having a good year, and whether for this or some other reason Simmons moved down to the third baseline along about the eighth inning, and started to heckle the Oriole players sitting in the bullpen. Champ stated in his deposition that Simmons was accusing the ballplayers of stealing the local women, and that he (Simmons) would show the Orioles what West Virginia manhood was like by blowing the players' heads off. Whatever was precisely said, the pitching coach then asked Simmons to leave.

After the game (Bluefield lost, 9–8, stranding three runners in the bottom of the ninth), Champ encountered Simmons in the parking lot. Simmons, in his complaint, offers no details of what ensued other than that he was punched and kicked by Champ and then hit in the jaw by a baseball bat wielded by Hicks, causing his jaw to be broken in two places. Champ's version was that Simmons saw him carrying a bat, made a gesture as if he were shooting Champ with his finger, and said "Oh, so you need a bat, huh?" Champ said "No, I don't," and threw his bat down. Simmons gestured toward his car and said, "Let's go over to my car, and I'll blow your head off." Another player tried to intervene, and Champ said "Just get out of here." Simmons then advanced threateningly upon him, and Champ hit Simmons in the face. Simmons was unfazed, and Champ kicked him in the chest, causing Simmons to stagger back. According to Champ he then smiled and said "I'm drunk. I didn't feel that." Champ turned to walk away, and at that point defendant Hicks hit Simmons. Simmons says Hicks hit him with a bat, but Hicks says that he used only his fist. Hicks had not been near any of the heckling and says he intervened because he was afraid Simmons was about to pull a gun on Champ.

For the purposes of the Orioles' motion to dismiss, of course, the court accepts the plaintiff's version of the events as true. The narrow legal question is whether the Orioles breached any legal duty to Simmons.

## I.

Both sides start with the proposition that the Orioles owed Simmons a duty of care to protect Simmons from reasonably foreseeable risks. They naturally disagree on the question of whether that duty was breached. Simmons claims that he attended the game as an "invitee, paid guest, [presumably he means 'paying guest'] and patron" of the Bluefield team, and that the Orioles organization was negligent in failing "to oversee, train, control, and instruct ... Hicks and Champ in using the Orioles' equipment and [in failing to instruct] Hicks, Champ, and the other members of ... the team ... in the manner, care, and conduct in which they were to treat the plaintiff as a patron, guest, or invitee...." He also alleges that the players assaulted him "in the course of their employment."

## A.

■ The latter contention may be speedily disposed of. The doctrine of *respondeat superior* applies only when the plaintiff proves that 1) at the time of the commission of the *tort* the servant was about his master's business, and 2) the servant was acting within the scope of his employment. *Master Auto Service Corp. v. Bowden*, 179 Va. 507, 19 S.E.2d 679, 680 (1942). Simmons can prove neither criterion. At the time of the assault the game was over, Champ and Hicks had left the locker room, and the altercation took place outside the confines of the ballpark. Champ and Hicks were not about any business for the Orioles, and it would be fatuous to suggest that the fight was within the scope of their employment. Therefore, no recovery can be based upon the grounds of *respondeat superior*.

## B.

The plaintiff contends, however, that Virginia has recognized the tort of "negligent hiring." *J. v. Victory Tabernacle Baptist Church*, 236 Va. 206, 372 S.E. 2d 391 (1988). In this case, the Virginia Supreme Court held that the mother of a ten-year old girl who was raped by a handyman had stated a claim against the church which had employed him. Unlike *respondeat superior*, liability may be imposed even if the servant is not acting within the scope of his employment. The test is whether the employer has negligently placed "an unfit person in an employment situation involving an unreasonable risk of harm to others." *Id.* at 211, 372 S.E.2d at 394.

Therefore the question becomes whether or not Champ and Hicks can be characterized as unfit persons. In *Victory Tabernacle*, the Supreme Court reversed a demurrer to a claim of negligent hiring, where the complaint alleged that the church knew or should have known that its employee "had recently been convicted of aggravated sexual assault on a young girl, that he was on probation for this offense, and that a condition of his probation was that he not be involved with children." *Id.* at 207, 372 S.E.2d at 392. Nevertheless, the complaint alleged, the church gave the employee free run of its building in a job that brought him frequently into contact with children, and as a result the plaintiffs' daughter had been raped "numerous times." *Id.* These allegations were held sufficient to support a claim of negligent hiring.

The Supreme Court also reaffirmed its holding in *Davis v. Merrill*, 133 Va. 69, 112 S.E. 628 (1922), a case in which a gatekeeper employed by the Norfolk & Western Railway Company shot at some motorists who had asked him to raise the gates to cross the tracks. A passenger in the car was killed. The Supreme Court said that there was ample evidence to show that the gatekeeper "was a man who would become highly incensed over a simple matter and get dangerously angry from slight provocation." *Id.* at 79, 112 S.E. at 631 (quoted in *Victory Tabernacle*, 372 S.E.2d at 393.) They continued:

We noted too, that the assailant had once before worked for Norfolk & Western and had been discharged. However, when he was interviewed for the gateman job no one made inquiry concerning his past record, habit, or general fitness for the position. We stated further that had Norfolk & Western investigated, it probably would not have offered the assailant the job. We then stated that employment of an improper person to come in contact with the public as the railroad's agent was gross misconduct. *Id.*

The plaintiff in the instant case, by contrast, makes no invidious allegations of any kind against Hicks and Champ.[1] No previous tendency towards violence was alleged or even suggested. The only reason offered to support plaintiff's contention that they were "unfit persons" is the submission that "lack of adequate training or instruction in sensitive situations in which employers have reason to know employees may be placed" may make an employee unfit. But this is not at all what is contemplated by the tort of negligent hiring. It conditions liability on the employer's knowledge that the employee's past *actions* strongly suggest that he is unfit for a job which involves an unreasonable risk of harm to others. *Victory Tabernacle*, 372 S.E.2d at 394. The plaintiff's proffered rule would extend the tort of negligent hiring far beyond the boundaries recognized in *Victory Tabernacle*, and, the court believes, beyond the bounds of common sense. It would be not only harsh to extend liability to an employer who has no

---

1. For the same reason, § 317 of the Restatement (Second) of Torts, cited by Simmons, does not make the Orioles liable for its servants' conduct. Section 317 provides that a master has a duty to exercise reasonable care in controlling his servant "while acting outside the scope of his employment as to prevent him from intentionally harming others" if, *inter alia*, the master "knows or has reason to know that he has the ability to control his servant" and "knows or should know of the necessity and opportunity for exercising such control." The plaintiff does not allege that the Orioles knew or should have known either one of these things.

knowledge of an employee's unfitness, but it would change the standard from one of negligence to strict liability. In other words, the employer would be liable for an employee's tortious actions even when that employee clearly was "fit." This outcome would subvert the policy behind the rule. If an employer were held strictly liable for the acts of an employee regardless of any knowledge of unfitness or negligence in obtaining such knowledge, the employer would have less incentive to investigate and weed out undesirable employees.

Therefore, the court has no hesitation in dismissing the negligent hiring count.

### C.

■ The question remains whether the Orioles had any other duty towards Simmons that it might have breached.

The law in Virginia is that the owner or proprietor of a place of amusement is not an insurer of the safety of his invitees. "His duty is to exercise reasonable care for their safety and protection—such care as would be exercised by an ordinarily careful and prudent person in the same position and circumstances." *Whitfield v. Cox*, 189 Va. 219, 223, 52 S.E.2d 72, 73-4 (1949); *New Bay Shore Corp. v. Lewis*, 193 Va. 400, 409, 69 S.E.2d 320, 326 (1952). For the purposes of the breach of duty alleged by Simmons, it is probably irrelevant that the game was over and the altercation took place outside the ballpark; if the Orioles' failure to instruct its ballplayers in dealing with patrons was a breach of any duty to the plaintiff it was just as much a breach outside the ballpark as in.

The Virginia Supreme Court went a long way towards answering the questions presented here in the case of *Wright v. Webb*, 234 Va. 527, 362 S.E.2d 919 (1987). There the plaintiff had been violently assaulted in a motel parking lot. The Supreme Court ruled that ordinarily acts of assaultive criminal behavior cannot reasonably be foreseen, and that even "knowledge of prior crimes against property does not create a duty upon a business invitor to anticipate and guard against assaults against its invitees, offenses involving a substantially different kind of criminal behavior." *Id.* at 531, 362 S.E.2d at 921. The specific rule laid down in *Wright* was that

> a business invitor, whose method of business does not attract or provide a climate for assaultive crimes, does not have a duty to take measures to protect an invitee against criminal assault unless he knows that criminal assaults against persons are occurring, or are about to occur, on the premises which indicate an imminent probability of harm to an invitee,

*Id.* at 533, 362 S.E.2d at 922.

Acknowledging the necessity of showing some knowledge on the part of the Orioles of an "imminent probability of harm," the plaintiff points to "the threats, the boisterous conduct, and the general atmosphere of danger" he himself created by ostentatiously heckling Orioles players. It hardly seems possible that a plaintiff would claim that a business invitor has a duty to protect an invitee from an "imminent probability of harm" when that probability resulted from the invitee's own actions, but that appears to be what this plaintiff is doing. Under this analysis, a storeowner would be liable for the after-hours assault of an individual who had made unprovoked, blood-curdling threats against an employee in the store, if the employee found the individual hanging around outside after work, and assaulted him. The climate-of-fear rule in *Wright v. Webb* was clearly not intended to protect a person who has instigated the problem. *See Annot., Liability for Injury to One Attending Wrestling or Boxing Match or Exhibition*, 14 A.L.R.3d 993 (1967).

This holding is supported by the only reported case cited to the court, or revealed by the court's own investigation, of baseball players attacking fans who were heckling them. *Atlanta Baseball Co. v. Lawrence*, 38 Ga.App. 497, 144 S.E. 351 (1928). There a pitcher jumped into the stands and attacked a fan who had been calling for his removal. The court, after iterating that the owner of the park was not an insurer of his customers' safety, found that the assault was not reasonably foreseeable, be-

ing such a rare occurrence. 144 S.E. at 352.

What is "foreseeable" is a question that rarely has an easy answer; some very unusual events have been held "foreseeable" by different courts at different times, and often "foreseeability" tends to be confused with the separate issue of proximate cause. *See* W. Keeton, *Prosser and Keeton on Torts,* (5th ed. 1984) ch. 7 § 43. The Texas Court of Civil Appeals once held the following sequence of events to be foreseeable: "A mudhole is negligently left in the highway; a car gets stuck in it and a man with a wooden leg attempts to pull the car out with a tow rope. His wooden leg becomes stuck in the mud and a loop in the tow rope lassos his good leg and breaks it." *Hines v. Morrow,* 236 S.W. 183 (Tex.Civ.App. 1922) quoted in *Keeton,* ch. 7 § 43. Such cases give the impression that foreseeability is an infinitely elastic legal theory which may be stretched around any sequence of events, however strange or unlikely. Hindsight makes anything appear more natural. But it is now recognized that even where "direct" causation is found, the unlikelihood of one or more of the events in the chain of causation will prevent recovery. *See Overseas Tankship (U.K.) Ltd. v. Morts Dock & Engineering, Ltd.,* [1961] A.C. 388 (shipowner not liable for discharge of oil which burned plaintiff's dock, since the high flash point of the oil made it difficult to ignite; owner could not foresee that sparks from welding on the dock would ignite cotton waste floating in the water, which in turn caused the oil to burn the dock), overruling *In Re Polemis and Furness, Withy & Co.,* [1921] K.B. 560 (plank dropped into hold of ship caused a spark which exploded gasoline vapors therein, destroying ship and cargo; liability found even though result not foreseeable because consequences were "direct.").

Seen in this light, the court believes that there is no question of foreseeability to submit to a jury, as the plaintiff would like to do. The claim that the Orioles had a duty to instruct all of their players how to handle hecklers is refuted by the ubiquity of heckling at baseball games at all levels, as anyone who has ever been to a Little League game knows, combined with the extreme rarity of players attacking spectators, reflected not only in the lack of reported decisions but in everyday knowledge. Although it might seem foreseeable, viewed in a vacuum, that heckling would lead the players to attack spectators, the facts are that it is virtually unheard of for this to happen. Using the term "foreseeability" as a test of practical likelihood, the court has no difficulty in finding that an attack such as this is not reasonably foreseeable. Therefore, the motion to dismiss the complaint against the Baltimore Orioles will be granted.

## II.

■ Defendant Bluestone Security Agency has moved for summary judgment. The plaintiff alleges that Bluestone had a contract with the Orioles to supply a security guard at the ballpark, and that its negligence in performing these duties was a proximate cause of Simmons' injuries.

A party moving for summary judgment is entitled to it as a matter of law where the party opposing the motion has failed to make a sufficient showing of an essential element of his case on which he has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the standard for a directed verdict under Fed. R.Civ.Proc. 50(a). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Rule 50(a) requires the trial judge to direct a verdict if, under controlling law, there can be only one reasonable conclusion as to the verdict. *Brady v. Southern R. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943). The standard under Rule 56 requires more than "the mere existence of *some* alleged factual dispute between the parties;" there must be "no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–8, 106 S.Ct. at 2510 (emphasis in original).

The claim against Bluestone rests on the assertion that it had a duty to be present at

the time the fight took place. The exact time is not precisely established in the record, but was clearly after 10:00 p.m.: Officer Brewster, the Bluefield, Virginia town policeman who arrived on the scene immediately after the fight listed the time in his report as 10:20 p.m., and Hicks and Champ recall it as occurring even later.

Jack Asbury, the Chief of Police of Bluefield, Virginia and the co-owner of Bluestone, deposed that Bluestone had a contract with the City of Bluefield, West Virginia, to provide security services for its city park. The park is located in both Virginia and West Virginia, but Bluestone's contract was with Bluefield, West Virginia only. As Mr. Asbury recalled it, Bluestone had had an agreement to provide a guard for the entire length of the ballgame some years previously, but this became too expensive and the special guard was dropped. He was not sure what specific hours the guards were supposed to work.

Herbert Sims, the Director of Parks and Recreation for the City of Bluefield, West Virginia, deposed that "maybe a couple weeks" before the fight he had cut Bluestone's patrol hours back from 5:00 p.m.–11:00 p.m. to 7:00 p.m.–10:00 p.m. in order to save money. He said that the agreement was for Bluestone to patrol the City Park, and that there was no agreement with them to provide security to Bowen Field, the ballpark.

William Asbury, Chief Asbury's son, was the supervisor, or general manager, at Bluestone. He was patrolling the park on the night of the incident. He stated that their agreement was to patrol the park from 7:00 p.m. to 10:00 p.m., Monday through Thursday, and 6:00 p.m. to 11:00 p.m. Friday, and 4:00 to 9:00 p.m. weekends. July 4th, 1988 was a Monday. Mr Asbury recalled that on holidays such as Independence Day, he started work earlier, but still quit at 10:00 p.m. Officer Brewster also stated that Bluestone's quitting time was 10:00 p.m.

Against this, there is only the testimony of George Fanning, the Orioles general manager, who recalled that "in recent years" Bluestone was patrolling within the ballpark and the parking lot outside. The only thing he knew about the city's agreement with Bluestone, however, was what he had been told by Mr. Sims and the City Manager of Bluefield, West Virginia. He said that he had seen them parked outside his office at the park, but "I don't know whether they're there all the time."

Based on these depositions, the court concludes that the plaintiff has failed to meet his burden under *Celotex*. There can be little doubt that Bluestone had no duty to patrol the park after 10:00 p.m. The only evidence to the contrary came from Mr. Fanning, who recalled seeing Bluestone officers present in the past, but was not directly involved with the provision of security services and would not, in the ordinary course of his duties, have known whether Bluestone's hours had been cut back by the City of Bluefield a week or so before the incident. In the face of the unequivocal evidence of the individuals directly involved, plus the corroboration of a disinterested police officer, there can be no genuine dispute that Bluestone had any duty to be present after 10:00 p.m.

The plaintiff, however, has sought to invoke Fed.R.Civ.Proc. 56(f), which allows the court to deny summary judgment where the affidavits of the party opposing the motion show "that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition...." The plaintiff's attorney's affidavit opposing the motion was made on December 7, 1988. On December 20, 1988, the court granted plaintiff an additional 45 days to take depositions or present other evidence in opposition to the motion.

No reason was set forth in the December 7 affidavit for the failure to present affidavits, however: it simply had not been done. Counsel provided a laundry list of persons from whom it desired to obtain information, and the court granted an extension of time for that purpose. The depositions taken by plaintiff's counsel during that time, as outlined above, contradicted rather than supported his contention that Bluestone should have prevented the fight. No reasons have been offered to explain counsel's

failure to depose the other people whom he thinks might shed light on the issue. Therefore, it is proper to grant summary judgment in favor of Bluestone. *Atkinson v. Bass*, 579 F.2d 865, 866 (4th Cir.1978).

Therefore, the Baltimore Orioles' motion to dismiss the plaintiff's claims will be granted, as will Bluestone's motion for summary judgment.

An appropriate Order will enter this day.