**Rose STITH, Plaintiff,**

v.

**Fabian THORNE, et al., Defendants.**

**No. 3:06 CV 240.**

United States District Court,
E.D. Virginia.
Richmond Division.

May 29, 2007.

Dale Wood Pittman, The Law Office of Dale W. Pittman, Petersburg, VA, Thomas Dean Domonoske, Law Office of Dale W. Pittman, Harrisonburg, VA, for Plaintiff.

Anna K. Essex, Newark, NJ, pro se.

Fabian Thorne, Newark, NJ, pro se.

Robert Edley, Jr., Godfrey Thadeus Pinn, Jr., Harrell & Chambliss LLP, Richmond, VA, Virginia Margaret Sadler, John O. Easton, Jordan Coyne & Savits LLP, Fairfax, VA, for Defendants.

### MEMORANDUM OPINION

DOHNAL, United States Magistrate Judge.

This matter is before the Court by consent of the parties on the Defendants Baltimore American Mortgage Corporation, Lehman Brothers Bank FSB [1] and its Successors in Interest, and Sparrow Enterprises d/b/a Prestige Mortgage's motions for summary judgment (docket entry nos. 71, 73, and 75). The Plaintiff, Rose Stith (the "Plaintiff" or "Stith"), and Defendant Southern Central Title, L.L.C., have also filed cross-motions for summary judgment (docket entry nos. 76 & 81). All of the motions are premised on the Defendants' alleged participation in a predatory lending scheme designed to steal the equity in Stith's home. The matter has been extensively briefed and the Court has entertained oral argument. For the reasons set forth herein, the motions of Baltimore American Mortgage Corporation, Lehman Brothers Bank, and its Successors in Interest, as well as Southern Central Title, are GRANTED; Prestige Mortgage's motion is DENIED; as is Stith's motion against Southern Central Title.

### I. Background and Procedural Posture

Stith filed a ten-count Amended Complaint (the "Complaint") against Defen-

1. The Court has entered an Order, pursuant to the parties' agreement, substituting U.S. Bank National Association ("U.S. Bank") for Lehman Bank as a defendant in this matter, and dismissing Lehman Bank from the case without prejudice (docket entry no. 96). The Order indicates that all previously filed pleadings and motions served and/or made by Lehman Bank "are deemed to have been filed, served and/or made by U.S. Bank []." The positions and arguments of the newly substituted party, therefore, are identical to those of its predecessor. For purposes of clarity and simplification, and because the parties' briefs refer to Lehman Bank's involvement in the transaction at issue (rather than U.S. Bank), the Court will not use the recently substituted party by name for purposes of this Memorandum Opinion. However, it is to be understood that any judgment rendered in favor of "Lehman Bank" is one applicable to U.S. Bank, and an accompanying Order will reflect that fact.

dants Fabian Thorne ("Thorne"), Anna K. Essex ("Essex"), Sterling Palmer ("Palmer"), Roscoe Friday ("Friday"), Sharon S. Linari ("Linari"), Prestige Mortgage ("Prestige"), American Credit Solutions, L.L.C. ("ACS"), Southern Central Title, L.L.C. ("SCT"), Baltimore American Mortgage Corporation ("BAMC"), and Lehman Brothers Bank FSB ("Lehman Brothers"). (Docket entry no. 64.) Stith alleges violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.* (2000), the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* (2000), the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* (2000), the Credit Repair Organization Act ("CROA"), 15 U.S.C. § 1679 *et seq.* (2000), and various violations of Virginia statutory and common law.[2] (Compl. ¶¶ 70–102.) The Complaint alleges that the refinancing plan was actually a predatory lending scheme by which the Defendants conspired to steal the equity in Stith's home.

The Clerk has entered default against Essex (docket entry no. 39), Thorne, Palmer, and ACS for their failure to respond (docket entry no. 56). Such a circumstance is significant because Thorne and Palmer were the alleged creators, facilitators, and ring leaders of the predatory lending scheme. Furthermore, Friday holds title to Stith's home and seeks to evict her. Due to their default, the Court will not address the claims pending against the defaulting parties.[3]

Stith seeks statutory, compensatory, treble, and punitive damages, as well as the creation of a constructive trust in her favor. She also seeks awards for her attorney's fees and costs.

## II. Facts and Material Inferences

Stith, delinquent on her bills, decided to refinance her home to avoid possible bankruptcy and in order to giver her time to pay her creditors. (Compl. ¶¶ 11–12, 29.) Thorne, a Prestige employee, contacted Stith and offered to help her solve her financial problems. (Compl. ¶¶ 20–21.) Thorne informed the Plaintiff that his plan would improve her credit and leave her with a refinanced home on favorable terms. (Compl. ¶ 30.) After their initial conversation, Stith agreed to accept Thorne's assistance to resolve her debt problems. (Compl. ¶¶ 24, 31.) Thorne told Stith to contact Palmer, who worked for both Prestige and ACS. (Compl. ¶¶ 21, 25–26.) The plan required Stith to transfer title to her home on the condition that she could re-purchase it after a year with a refinanced loan after working to improve her credit rating with a credit repair company (ACS). (Compl. ¶ 54.)

Stith's understanding was that Thorne would pay off her debts. (Compl. ¶ 48.) In essence, Stith thought the plan was that Thorne would pay her debts, that title to her home would be held for one year by Friday while she continued to live there and worked to improve her credit rating with the assistance of ACS (Compl. ¶¶ 6, 57), that at the end of the one year she would be given a refinanced loan to reimburse Thorne the amount of the debts that were paid on her behalf, and that everything would be done legally. (Compl. ¶ 48.)

---

2. Namely, violations of the Virginia Credit Services Business Act, Va.Code Ann. § 59.1–335.1 *et seq.* (2006 Repl.Vol.), the Virginia Consumer Protection Act, Va.Code Ann. § 59.1–196 *et seq.* (2006 Repl.Vol.), common law fraud and conspiracy, as well as violation of the Virginia Wet Settlement Act, Va.Code Ann. § 6.1–2.10 *et seq.* (1999 Repl.Vol. & Cumm. Supp.2006).

3. Thorne and Essex have filed a joint motion seeking to set aside their default (docket entry no. 94). The Court will resolve this motion in the near future.

Stated another way, Stith would convey title of her home to Friday who would agree to sell the home back to her once her credit score had improved and she had qualified for a new acquisition loan. Meanwhile, Stith would remain in the home and pay rent to Friday while Palmer, through ACS, would work to repair Stith's poor credit.

Stith agreed to the plan. (Compl.¶ 31.) On September 16, 2005, Stith and Friday signed a document entitled "General Contract" that provided for the sale of Stith's home to Friday and the re-sale of the home back to Stith. (Compl. ¶ 41 & Ex. J.) Stith also signed a Central Virginia Regional MLS Purchase Agreement in which she agreed to sell her home to Friday for $125,000. (BAMC's Mem. Supp. Mot. Summ. J ("BAMC's Mem.") at 4, ¶ 16 & Ex. B (docket entry no. 72.)) The document also provided, however, that Friday (as the purchaser) would not occupy the property as his principal place of residence. (*Id.*) Stith paid ACS $350.00 for credit repair services. (Compl., Ex. M.)

On September 29, 2005, Stith conveyed her home (the "Property") to Friday, by deed dated September 28, 2005. (Compl. ¶ 49; BAMC's Mem., Ex. A.) To finance the acquisition of the Property, Friday (through broker Prestige) obtained two loans from BAMC—one in the amount of $94,400 (the "First Friday Loan"), and a second one in the amount of $23,600 (the "Second Friday Loan"), for a total amount of $118,000 (collectively, the "Friday Loans"). (BAMC's Mem. at 2.) Each loan is secured by a lien deed of trust on the Property. (*Id.*)

Southern Central Title ("SCT") was to provide and conduct the settlement for the sale of Stith's home to Friday. (Compl.¶¶ 34, 58.) An SCT employee conducted the closing. (Compl.¶ 34.) [4] Linari signed a HUD–1 Settlement Statement (which itemized all charges imposed in connection with the transaction) at the closing for the First Friday Loan on behalf of the Plaintiff pursuant to a Specific Power of Attorney obtained from Stith. (Compl. ¶¶ 35–36 & Ex. F.) The Power of Attorney was to be utilized for the execution of all documents necessary "for the consummation for the refinance of" Stith's home, and further indicated that "[t]his power of attorney is for the consummation of the real estate transaction for the purchase and settlement of the property[.]" (Compl., Ex. G.) It specifically appointed Linari as "the true and lawful attorney for" Stith to sign the closing documents on Stith's behalf. (*Id.*) Thus, the undisputed evidence demonstrates that Stith authorized Linari—as Stith's attorney-in-fact—to sign the documents necessary to settle and close on the sale of her home to Friday. Moreover, a paper entitled "Forfeit of Proceeds Document" that was signed by Stith and maintained by SCT during the settlement process named Thorne as the creditor (and authorized the proceeds from the sale of Stith's home to be paid directly to him), but it did not list the amount of money that he was to receive. (Compl. ¶ 47 & Ex. O.) Nevertheless, Stith alleges that Linari, on behalf of SCT, intentionally misrepresented the manner in which she would use the Power of Attorney and that she concealed the HUD–1 Settlement Statement to prevent Stith from learning how much Thorne received in the settle-

---

4. The Complaint alleges that Linari conducted the closing. (Compl.¶ 34.) However, by way of affidavit, Linari attested that she "did not conduct the closing ... when Rose Stith sold her house to Roscoe Friday," and that this closing was conducted by another employee of SCT. (SCT's Resp. to Pl.'s Mot. for Partial Summ. J. and Cross Mot. for Partial Summ. J. ("SCT's Resp."), Ex. 1 ("Linari Aff.") ¶ 2 (docket entry no. 80.))

ment, thus preventing Stith from discovering the existence of the predatory lending scheme. (Compl. ¶¶ 81–83.) She also maintains that the fact of the Forfeit of Proceeds Document failing to indicate how much Thorne was to receive could reasonably be viewed as an intentional omission used by the Defendants to conceal how much money Thorne would actually receive from the sale of the home.

As reflected in the HUD–1 Settlement Statement, Stith's previous mortgage holder received a payoff of $57,893.04. (Compl. ¶ 40 & Ex. F, line 504.) Prestige received a check for $1,514.00 for closing costs (*id.* lines 801, 804, and 805), and Thorne received a check for $55,640.76, which was understood by Stith to be used for the payment of her debts. (*Id.* line 518.) Stith has also acknowledged in deposition that she assumed Thorne was to be paid something for his services, and these intentions are reflected through her execution of the Forfeit of Proceeds Document. Friday thereafter received the title to Stith's home.

In regard to the $55,640.76 paid directly to Thorne, none of those funds were provided to the broker, Prestige. (BAMC's Mem. at 6, ¶ 29 & Ex. I.) Stith stated that she received only $9,500 (BAMC's Mem., Ex. C ("Stith Dep.") 128:1–13), while Friday received $20,000 (SCT's Resp., Ex. 7 ("Friday Dep.") 34:23–36:20 (docket entry no. 80.)) According to Friday, he received two distinct payments: a $10,000 payment for buying Stith's home, and another $10,000 payment to be used toward payment of the mortgage. (*Id.*) Both payments were made by Thorne. (*Id.*) Both BAMC (as the lender) and SCT (as the settlement agent) assert they were unaware of the payments made to either Stith or Friday. (BAMC's Mem. at 6, ¶ 33; SCT's Resp. at 2.)

Stith alleges that BAMC should have known that Stith did not sign the HUD–1 Settlement Statement. (Compl. ¶ 53.) Stith further claims that she never received the benefits promised to her under the plan by Thorne. (Compl. ¶ 66.)

On November 14, 2005, Lehman Brothers Bank FSB ("Lehman Bank") purchased the Friday Loans from BAMC pursuant to an agreement dated October 13, 2005. (Compl. ¶¶ 9, 100; Lehman Bank's Mem. Supp. Mot. Summ. J. ("Lehman Bank's Mem.") at 2, ¶ 4 & Ex. A ("Peterson Aff.") ¶¶ 2–4 (docket entry no. 74.)) Lehman Bank claims that at the time it acquired the Friday Loans, it was neither aware of, nor had reason to know of the matters Stith has alleged in this action. (Peterson Aff. ¶ 7.) Lehman Bank thereafter sold the loans to two New York common law trusts (the "Successors"). (*Id.* ¶¶ 5–6.)

### III. *Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party. *Id.* at 255, 106 S.Ct. 2505.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). Indeed, summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. *Lewis v. City of Va. Beach Sheriff's Office,* 409 F.Supp.2d 696, 704 (E.D.Va.2006) (citations omitted). And, of course, the Court will not weigh the evidence or make credibility determinations in its summary judgment analysis. *Williams v. Staples, Inc.,* 372 F.3d 662, 667 (4th Cir.2004).

A "material fact" is a fact that might affect the outcome of a party's case. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *JKC Holding Co. LLC v. Wash.* *Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir.2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Hooven–Lewis v. Caldera,* 249 F.3d 259, 265 (4th Cir.2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## IV. Analysis of the Pending Motions for Summary Judgment

### 1. BAMC's Motion for Summary Judgment

Count IX of Stith's Complaint alleges that BAMC violated the Virginia Wet Settlement Act (the "WSA"), Va.Code Ann. § 6.1–2.10 *et seq.,* by "indirectly caus[ing] payment to be made pursuant to an understanding or agreement for referral of business incident to the services required to complete the settlement." (Compl.¶ 92.)[5] BAMC raises three issues as to why summary judgment should be granted in its favor: (1) the WSA does not provide a private right of action for the violation of Section 6.1–2.13:1(A) (Cumm.Supp.2006); (2) that even if the WSA does provide a private cause of action, the undisputed facts do not indicate that BAMC violated the WSA; and (3) that any claim that BAMC violated Section 6.1–2.13:1(A) is barred by the doctrine of *in pari delicto,* as a matter of law.[6] (BAMC's Mem. at 1.)

---

5. This the only cause of action lodged against BAMC.

6. The doctrine of *in pari delicto* stands for the principle that "a plaintiff who has participated in the wrongdoing may not recover damages resulting from the wrongdoing." *Black's Law Dictionary* 806 (8th ed.2004); *see also In re Bogdan,* 414 F.3d 507, 514 (4th Cir.2005) ("The common-law doctrine of *in pari delicto* (meaning 'of equal fault') is often described as an affirmative defense that bars

### A. Whether a Private Right of Action Exists under the WSA

■ The WSA was enacted to insure prompt disbursement of settlement proceeds. *Town and Country Properties, Inc. v. Allen,* 23 Va. Cir. 389, 1991 WL 834918 (1991). To that end, the WSA places specific duties on lenders and settlement agents to expedite the disbursement of loan funds and settlement proceeds. *See* Va.Code Ann. §§ 6.1–2.12 (duties of lenders) and –2.13 (duties of settlement agents). Accordingly, the WSA provides that a civil action may be pursued by those who are injured by a lender's *failure to disburse* pursuant to Section 6.1–2.12, or a settlement agent's *failure to disburse* as mandated by Section 6.1–2.13. Specifically:

Any person suffering losses due to the failure of the lender or settlement agent *to cause disbursement* as required by this chapter, shall be entitled to recover, in addition to other actual damages, double the amount of any interest collected in violation of § 6.1–2.12 of this chapter plus reasonable attorney's fees incurred in the collection thereof.

Va.Code Ann. § 6.1–2.15 (emphasis added). Thus, Section 6.1–2.15 permits an injured party to, *inter alia,* bring a civil action against a lender who fails to cause timely disbursement of loan proceeds, and the injured party may recover actual damages, double the amount of any interest paid, plus reasonable attorney's fees.

Stith, however, does not allege in her Complaint that BAMC violated either Section 6.1–2.12 or –2.13. Indeed, it is undisputed that BAMC timely disbursed the loan proceeds to SCT (the settlement agent) which ultimately enabled Friday to purchase Stith's home. (BAMC's Mem. at 2.) Rather, Stith claims that BAMC violat-

ed the anti-kickback provision of the WSA, which provides:

No person selling real property, or performing services as a . . . lender incident to any real estate settlement or sale, shall pay or receive, directly or indirectly, any kickback, rebate, commission, thing of value, or other payment pursuant to any agreement or understanding, oral or otherwise, that business incident to services required to complete a settlement be referred to any person. For purposes of this section, *"thing of value"* means any payment, advance, funds, loan, service or other consideration.

Va.Code Ann. § 6.1–2.13:1(A) (emphasis in original). The WSA imposes criminal sanctions for certain violations of this Section, namely, it is a misdemeanor to knowingly and intentionally violate Section 6.1–2.13:1(A), and violators are subject to a fine of up to $1,000 per violation. *Id.* § 6.1–2.13:1(D). The parties present the issue as whether a person aggrieved by another's violation Section 6.1–2.13:1(A) is permitted to bring a private cause of action pursuant to Section 6.1–2.15.

■ The Court deems it unnecessary to address this issue because, even if the WSA does provide a private cause of action to redress her injuries, Stith is unable to demonstrate a genuine issue of material fact that BAMC was a *knowing* participant who "paid" a "thing of value" pursuant to an "agreement or understanding" that business incident to services required to complete a settlement be referred to any person. *See* Va.Code Ann. § 6.1–2.13:1(A).

### B. Whether Stith has Proffered Sufficient Facts to Support Her Claim that BAMC Violated the WSA

To prove that BAMC violated Va.Code Ann. § 6.1–2.13:1(A), Stith must prove: (1)

a wrong-doer from recovering against his alleged co-conspirators.") (citations omitted).

that a person (2) was ... performing services as a ... lender[7] incident to any real estate settlement or sale; (3) that the person *paid* or received, directly or indirectly, a(i) kickback, (ii) rebate, (iii) commission, (iv) thing of value, or (v) other payment; *and* (4) that such payment or receipt of a thing of value was pursuant to an *agreement or understanding*, oral or otherwise, that business incident to services required to complete a real estate settlement be referred to any person. BAMC contends that there exist no material facts sufficient to overcome summary judgment demonstrating: (1) an "agreement or understanding" between it and some third person to pay or receive a kickback, rebate, thing of value, or other payment; or (2) that BAMC "directly or indirectly" "paid" a kickback, rebate, thing of value, or other payment. At most, BAMC asserts that it merely made a "disbursement of loan funds" to the settlement agent, the Defendant SCT. (BAMC's Mem. at 15.)

### i. Did BAMC Enter Into Any "Agreement or Understanding," Oral or Otherwise, With Any Other Party or Third Party?

Nowhere in her Complaint does Stith allege that BAMC was a part of, or even aware of, the ongoing predatory lending "plan" or "scheme." (*See* Compl. ¶¶ 31–33, 54, 56–59, 69, 87 (the allegations concerning an "agreement," "plan," or "conspiracy" do not include BAMC.)) Indeed, BAMC is not implicated as a party to Stith's conspiracy claim levied against defendants Thorne, Essex, Palmer, Friday, Linari, Prestige, ACS, and SCT. (Compl. ¶¶ 87–89.) Rather, Stith only alleges that BAMC "provided the necessary financing for this predatory scheme." (Compl.¶ 2.)

But if BAMC did not know of or agree to participate in any purported predatory lending conspiracy, it could not have made an "agreement or understanding" with anyone pursuant to which BAMC would "pay ... a kickback." *See* Va.Code Ann. § 6.1–2.13:1(A). In simple terms, BAMC suggests that if Stith has not alleged the existence of an agreement between BAMC and another party to provide a prohibited payment, such a deficiency is fatal to her WSA claim.

Stith, however, claims that a genuine issue of material fact exists as to whether BAMC was aware of the predatory scheme. (Pl.'s Opp'n BAMC's Mot. Summ. J. ("Pl.'s Opp'n to BAMC") at 1 (docket entry no. 82.)) Stith strenuously asserts that BAMC "provides no affidavit to support" its assertion of lack of knowledge, and "its failure to do so ... allows for an adverse inference against" BAMC. (*Id.* at 1–2.) Such a conclusion is foreclosed by Rule 56(b), which states that "[a] party against whom a claim ... is asserted ... may, at any time, move with or *without* supporting affidavits for a summary judgment[.]" Fed.R.Civ.P. 56(b) (emphasis added). Indeed, a genuine issue for trial exists when the *non-moving party, i.e.,* Stith, reaches beyond the pleadings and demonstrates specific facts by affidavit or deposition, answers to interrogatories, and admissions on file. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. There is simply no requirement that BAMC, as the moving party on the motion, submit an affidavit asserting that it was unaware of the existence of the predatory lending scheme when it disbursed the funds, or that BAMC's failure to do so allows for an "adverse inference" against it. The Com-

7. The WSA defines a "lender" as "any person regularly engaged in making loans secured by mortgages or deeds of trust on real estate." Va.Code Ann. § 6.1–2.10. There is no dispute that BAMC's role in this transaction was anything other than a "lender" as that term is defined in the WSA.

plaint is devoid of allegations that BAMC knew about, much less participated in, the alleged conspiracy/predatory lending scheme, and the undisputed facts in the record support such a position.

In an effort to establish that BAMC agreed or understood that its disbursement of loan funds would be used to provide a kickback or other payment to a third party, Stith offers a number of suppositions that purportedly demonstrate BAMC's awareness of the improperly used proceeds. First, Stith argues that the appraisal documents forming the basis of the loan had "several suspicious aspects," including "unexplained jumps" in the value of comparable properties in Stith's neighborhood used to determine the market value of Stith's home, as well the fact that the "Operating Income form" stated that Stith's home was currently being rented when, in actuality, it was "owner occupied." (Pl.'s Opp'n to BAMC at 2.) But the "unexplained jumps" in the value of comparable properties, as well as the inaccurate statement that Stith's home was currently being rented (rather than "owner occupied") do not support even an inference that BAMC agreed or understood that loan funds would be used to provide a kickback to Friday.

Stith makes much of the fact that even though the Loan Approval Form stated that no additional contributions were to be given to Friday, BAMC was aware that Friday did, in fact, receive an additional contribution from Thorne to close the transaction. But, again, this "disputed" fact is essentially immaterial to a determination of whether BAMC agreed to pay improper kickbacks. Rather, Friday testified by deposition that he never spoke with BAMC when he applied for the loans. (Friday Dep. 67:4–9.) And, moreover, BAMC's corporate representative's sworn deposition testimony indicates that there was no way for BAMC to determine whether this "no additional contribution condition" was met *prior to closing*. (Pl.'s Opp'n to BAMC, Ex. D ("Wheat Dep.") 205:2–6.) Since BAMC was not aware that the condition could have been violated until after it disbursed the loan proceeds, no reasonable factfinder could conclude that BAMC agreed or understood that its disbursement was to be used as an indirect, improper kickback before disbursement.

Finally, Stith asserts that BAMC knew its loan proceeds would be used improperly because BAMC approved an unsigned copy of the final version of the HUD–1 prior to settlement. The HUD–1, on line 518, indicated that Thorne was to be paid $55,640.76 from the seller's (Stith's) proceeds. (Compl., Ex. F.) Stith argues that the payment to Thorne should have raised a "red flag" to BAMC that its loan was going to be used as an improper kickback to a party not involved in the real estate transaction. However, BAMC did not have the "right to approve or disapprove the seller's [*i.e.,* Stith's] disbursement of their funds," and "the approval that [it gave] in no way [was] an approval of the payment being made to Fabian Thorne." (Wheat Dep. 126:22–127:7, attached to BAMC's Mem. as Ex. F.)

Stith, as the non-moving party on BAMC's motion for summary judgment, has failed to meet her burden of demonstrating more than a mere scintilla of evidence to support her case. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. There simply is no evidence that BAMC agreed with anyone to make an improper kickback to a third party, or that it understood that any portion of the disbursed loan proceeds would be used for that purpose.

**ii. *Did BAMC "Directly or Indirectly" "Pay" Any Kickback, Rebate, Thing of Value, or Other Payment?***

BAMC also argues that it could not have paid anyone anything of value in the con-

text of Stith's loan. As the lender, BAMC was required to "cause *disbursement of loan funds* to the settlement agent" at or before the loan closing. Va.Code Ann. § 6.1–2.12 (emphasis added). "Loan funds" are defined as the "gross or net proceeds of the loan to be disbursed by the lender at loan closing," *id.* § 6.1–2.10, and "disbursement of loan funds" means the "*delivery* of loan funds by the lender to the settlement agent . . . ." *Id.* (emphasis added). There is no dispute that BAMC disbursed the loan funds to the settlement agent in this case. And, it would appear that the Virginia General Assembly did not intend for the term "disbursement of loan funds" to mean "pay" as that term is used in the WSA. Indeed, nowhere in the definitions applicable to "lenders" under the WSA do the statutory provisions use the term "pay" or "payment."

To the contrary, the only party to a loan settlement that "pays" anyone is the settlement agent. "The settlement agent . . . shall cause *disbursement of settlement proceeds* within two business days of settlement . . . ." *Id.* § 6.1–2.13 (emphasis added). "Disbursement of settlement proceeds" means "the *payment* of all proceeds of the transaction by the settlement agent to the persons entitled thereto." *Id.* § 6.1–2.10 (emphasis added). The distinction is critical. Legislatures are presumed to act with purpose so that every phrase in a statute is given particular importance. Thus, this Court is "obliged to give effect, if possible, to every word" used in the WSA, *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (citation omitted), and all parts of the statute must be construed so that each part has meaning, *see United States v. Snider,* 502 F.2d 645, 652 (4th Cir.1974). The lender must only deliver or transfer the proceeds of the loan to the settlement agent and, in so doing, the lender relinquishes legal title over the loan funds to

the settlement agent. In effect, the lender does not "pay" anything when it disburses funds to the settlement agent. So if BAMC didn't "pay" anything, then it can't be liable under the WSA. *See* Va.Code Ann. §§ 6.1–2.12 (lender must disburse loan funds to the settlement agent), –2.15 (damages appropriate where lenders "fails to cause disbursement as required by this chapter"). Such a construction does not render the anti-kickback provision of the WSA, Section 6.1–2.13:1(A) (lender violates provision if he "pay[s] . . . any kickback"), meaningless. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (internal quotation marks and citations omitted). Section 6.1–2.13:1(A) allows for the situation where the lender, either prior to or soon after delivering the loan funds to the settlement agent, pays an improper kickback to another party in the form of an agreed upon referral fee. For example, BAMC could not pay a kickback to SCT in exchange for SCT's influencing the borrower's selection of BAMC as the lender in the real estate transaction. Such would clearly be impermissible under Section 6.1–2.13:1(A) of the WSA (because the lender would have paid a kickback to the settlement agent for the latter's referral of business to the lender), but would not be at odds with the lender's duty to deliver, *i.e.,* "disburse," the loan funds to the settlement agent prior to closing, *see* Section 6.1–2.12.

Thus, Stith cannot argue that BAMC "indirectly" paid a kickback on the reasoning that the loan funds were ultimately used as a kickback payment to Friday, where such liability is predicated only on BAMC's disbursement of the loan pro-

ceeds to the settlement agent, SCT. This is so because the WSA does not impose blanket liability on a lender whose funds are later used in an improper way without the lender's knowledge. This is why the WSA requires that the illegal kickback be made pursuant to an "agreement or understanding" with a third party.

Stith argues that a reasonable trier of fact could find that BAMC violated the WSA when it failed to cause proper disbursement. (Pl.'s Opp'n to BAMC at 9.) SCT gave the loan proceeds of $55,640.76 to Thorne pursuant to its alleged agreement with Thorne, and Thorne gave $20,000 of this to Friday for his role in the transaction pursuant to their "agreement or understanding." Stith argues that the payment to Friday was a prohibited payment under the WSA because, as a purchaser who was "renting his credit," although Friday's services were incident to the transaction, they were not earned. (*Id.*) Stith then concludes that when BAMC approved the payment of the fee to Thorne, it was indirectly allowing the prohibited payment to be made. (*Id.* at 10.) "Its approval of a payment of all a seller's equity to the same man who it knew made a prohibited contribution to the buyer is an example of how it failed to cause disbursement to be proper." (*Id.*) But to accept Stith's logic would be to read into the WSA a strict liability component that would impose liability on any lender who disburses funds that are later used in an improper manner without the lender's prior knowledge. This interpretation of the WSA would usurp the statute by ignoring the General Assembly's clear pronouncement that the wrongdoer's payment of a kickback, even if indirect, must be made pursuant to an "agreement or understanding." Stith's reasoning cannot stand because

"where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal quotation marks and citations omitted). Because there is no evidence that BAMC was ever aware that Thorne was going to pay Friday after BAMC disbursed the loan proceeds, BAMC is not liable under the WSA.[8]

## 2. Lehman Brothers Bank's Motion for Summary Judgment

Count X of Stith's Complaint seeks equitable relief in the form of a constructive trust as to the property at issue, *i.e.,* Stith's former home (the "Property"). The Defendant Lehman Bank purchased the two loans secured by deeds of trust on the Property, and has since sold the loans to two New York common law trusts (the "Successors"). (Lehman Bank's Mem. at 1.) Lehman Bank and the Successors have filed a motion for summary judgment in which it is asserted that: (1) they are *bona fide* purchasers for value and, as such, their interests in the Property cannot be diminished by a constructive trust; and (2) any claim for equitable relief by Stith that would diminish the interests of the Successors in the Property is barred by the doctrine of *in pari delicto* and unclean hands. (*Id.*)

Any liability of Lehman Bank necessarily depends on the actions of BAMC for, after all, BAMC sold the Friday Loans to Lehman Bank and the Complaint alleges that BAMC "should have known that the loan closing [for the Friday Loans] was not proper, because the ... Settlement Statement was signed under a Power of Attor-

---

8. It is therefore also unnecessary for the Court to address BAMC's alternative argument that the doctrine of *in pari delicto* operates to bar Stith's claim for relief.

ney." [9] (Compl. ¶ 96.) But, as previously noted, the facts are lacking that would even allow for a reasonable inference that BAMC was aware of the predatory lending scheme, and there certainly is no basis to conclude that Lehman Bank had reason to necessarily know of the improprieties alleged in Stith's Complaint. Stith simply intimates that because BAMC "should have known" that the loan closing was improper in light of the Settlement Statement being signed under a Power of Attorney, Lehman Bank—as BAMC's successor—should be imputed with the same knowledge. This is the exact sort of "speculative allegation[ ]" a non-moving party may not rely on to defeat a motion for summary judgment. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir.2002) (citation omitted).

The facts indicate that BAMC funded the Friday Loans *before* it obtained a signed copy of the HUD–1 Settlement Statement (Lehman Bank's Reply at 4) (docket entry no. 87), thus supporting the conclusion that it had no notice that the final Settlement Statement was signed pursuant to a Power of Attorney (even if such a procedure is impermissible). BAMC funded the Friday Loans on September 29, 2005. (Lehman Bank's Mem. at 10.) BAMC's settlement agent, Stewart Mortgage, did not receive a copy of the Settlement Statement until October 3, 2005. (*Id.* at 10–11.) Thus, BAMC had no notice, constructive or otherwise, of the fact that the Settlement Statement was signed pursuant to a Power of Attorney. If the notice or knowledge attempted to be shown on the part of a purchaser of a note is notice or knowledge provided to the purchaser *after* the purchaser acquired the note and parted with consideration, such notice does not void the purchaser's status

as a *bona fide* purchaser. *Elmore County Bank v. Avant*, 189 Ala. 418, 66 So. 509, 510–11 (1914).

■] To attain the status of a *bona fide* purchaser for value, a mortgagee must establish that it paid value for its interest in the property without notice of the plaintiff's rights. *Ransome v. Watson's Adm'r*, 145 Va. 669, 134 S.E. 707, 709 (1926). Such notice "must be clear and strong and such as to fix upon [the purchaser for value] the imputation of *mala fides*," *i.e.*, bad faith. *Vicars v. Salyer*, 111 Va. 307, 68 S.E. 988, 990 (1910). "A mere suspicion of notice, even though it be a strong suspicion, will not suffice." *Id.* The purchase of the Friday Loans from BAMC, *by itself*, could not constitute bad faith on the part of Lehman Bank. Lehman Bank purchased the Friday Loans on November 14, 2005. (Peterson Aff. ¶ 4.) At the time of this purchase, it had neither actual nor constructive knowledge of the improprieties alleged in Stith's Complaint. (*Id.* ¶ 7.) Stith's argument that the Lehman Bank should have known of the wrongful actions that were taking place in the Stith transaction due to the mere fact that the HUD–1 was signed pursuant to a power of attorney does not create a genuine issue of material fact since there is no authority for the proposition that a HUD–1 may not be executed in such a manner.

■ A *bona fide* purchaser—that is, one who, without such knowledge or notice of improper actions, actual or constructive, and who has not been put on such inquiry as would lead to knowledge or notice, and has paid the consideration—will be protected even against the alleged fraud of his grantor. *See Neff v. Edwards*, 148 Va. 616, 139 S.E. 291, 294 (1927) (citation omitted). Thus, even if BAMC's actions were

9. The Court can find no authority for the proposition that a HUD–1 Settlement State-

ment may not be signed pursuant to a Power of Attorney.

improper, Lehman Bank's lack of knowledge of the wrongdoing when it purchased the loans from BAMC would still render it a *bona fide* purchaser. Lehman Bank is therefore entitled to summary judgment.

■ With respect to the Successors, because they took the Friday Loans with the same *bona fide* status as their grantor (Lehman Bank), they are also entitled to summary judgment. *See id.* Stith has presented the Court with nothing more than surmise about whether it is "plausible" that BAMC or Lehman Bank had notice about the predatory lending scheme. (Pl.'s Opp'n at 2–3.) Such mere surmise fails to satisfy the requirements necessary to survive summary judgment and is the very kind of "metaphysical doubt" as to material facts that the Supreme Court has said does *not* carry the non-moving party's burden of establishing genuine issues for trial. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Furthermore, a *bona fide* purchaser's interest in property is not subject to the imposition of a constructive trust. *See Carter v. Allan*, 62 Va. (21 Gratt.) 241, 249 (Va.1871) ("... it has been the uniform course of decision in this State, as well as in the other States of the Union, to hold that the *bona fide* purchaser of a legal title is not affected by any latent equity founded on a trust, fraud or incumbrance, or otherwise, of which he had not notice, actual or constructive.") (citations omitted). Such requested relief, therefore, is precluded as a matter of law, and summary judgment is appropriate with respect to Lehman Bank and the Successors.

### 3. Prestige's Motion for Summary Judgment

Prestige's motion for summary judgment (docket entry no. 75) is primarily based on the alleged lack of an employer-employee relationship between it and the Defendants Palmer and Thorne. Absent proof of any such relationship, Prestige contends that it cannot be held vicariously liable for any of Palmer's and Thorne's alleged actions. (Prestige's Mem. Supp. Mot. Summ. J. ("Prestige's Mem.") at unnumbered page 2.) But even if such an agency relationship is found, Prestige argues that Palmer's and Thorne's involvement in the transaction with Stith "fell well outside the scope of their employment related duties." (*Id.*)

### A. Facts Relevant to Prestige's Motion

Prestige is a licensed mortgage broker, and its president and owner is Arthur Lewis ("Lewis"). (Prestige's Mem., Ex. 1 ("Lewis Aff.") ¶¶ 1–2.) In April 2005, Prestige contracted with Defendant Palmer to provide loan origination services. (Lewis Aff. ¶ 4.) Palmer's compensation was to consist of earned commissions only, whereby he would receive seventy-five percent (75%) of the brokerage fees earned by Prestige for any loans that he originated on its behalf. (Lewis Aff. ¶ 5.) Prestige gave Palmer authority to hire other loan officers and processors to assist him with loan origination, subject to Lewis' final approval. (Lewis Aff. ¶ 6.) Anyone hired by Palmer was compensated out of his commission and reported directly to him, not Lewis. (Lewis Aff. ¶ 7.)

Palmer hired Thorne to work with him as a loan officer. (Lewis Aff. ¶ 8.) Prestige and Thorne never entered into a contract to define the scope of Thorne's employment or otherwise set out the parameters of any direct business relationship. (Lewis Aff. ¶ 9.) Neither Palmer nor Thorne were contractually obligated to work exclusively for Prestige and, in fact, Palmer was also employed by American Credit Solutions ("ACS"). (Lewis Aff. ¶ 11.)

Prestige claims it had very limited oversight of Palmer and Thorne. (*See* Lewis

Aff. ¶ 12.) Moreover, Prestige has never had any interest in ACS, it has never been in the credit repair business, nor has it ever authorized its loan originators to provide credit repair services on its behalf; and Prestige has never functioned as a mortgage lender, or provided anyone with a mortgage or home equity loan notwithstanding any representations that Thorne may have allegedly made to Stith that were to the contrary. (Lewis Aff. ¶¶ 13, 17.) Meetings between Stith and Thorne never occurred at Prestige's office, and communications between the two occurred exclusively by way of Thorne's cell phone rather than by way of Prestige's office equipment. (Prestige's Mem., Ex. 2 ("Stith Dep.") 165:10–166:25.)

In sum, Prestige claims that "[a]nything Palmer and Thorne allegedly did to assist [ ] Stith, including, without limitation, facilitating the sale and re-acquisition of her home, refinancing her mortgage and repairing her credit, were done for their own personal benefit, independent of their relationship with Prestige." (Lewis Aff. ¶ 21; see also Prestige's Mem., Ex. 3 ("Thorne Aff.") ¶¶ 4–5.) Prestige claims that it had "no knowledge of, involvement in nor derived any benefit from the alleged arrangement between [Stith], Thorne and Palmer outside of brokering the mortgage loan between [ ] Friday and [BAMC]" which allowed for Friday to acquire title to Stith's home. (Lewis Aff. ¶ 22.) Accordingly, Prestige requests summary judgment as to all counts in which it is implicated.

Stith, on the other hand, contends that genuine factual issues remain disputed such that the matter should proceed to trial. After all, as a result of Thorne and Palmer's efforts, Prestige received $1,514.00 in brokerage fees once the home was sold. (See Compl., Ex. F, Lines 801, 804, and 805.) Such fees could not have been received by Prestige, asserts Stith, without the efforts of Thorne and Palmer acting in their roles as employees of Prestige.

## B. Analysis

### i. Were Palmer and Thorne Independent Contractors?

 Although Prestige claims that it "did not routinely oversee Palmer['s] . . . activities" (Lewis Aff. ¶ 12), it is clear by Prestige's own admission that a reasonable factfinder could conclude that Palmer was indeed Prestige's employee. (Lewis Aff. ¶ 4 (In April 2005, "Prestige contracted with [ ] Palmer solely for the provision of loan origination services.").) And, in Virginia:

> When the plaintiff presents evidence to show the existence of an employer-employee relationship, she has established a *prima facie* case triggering a presumption of liability. The burden of production then shifts to the employer, who may rebut that presumption by proving that the employee had departed from the scope of the employment relationship at the time the injurious act was committed. If the evidence leaves in doubt the question whether the employee acted within the scope of the employment, the issue is to be decided by the jury and not as a matter of law by the trial court.

*Majorana v. Crown Cent. Petroleum Corp.*, 260 Va. 521, 539 S.E.2d 426, 429 (2000) (internal citations and emphasis omitted). Prestige's concession establishes that a *prima facie* employer-employee relationship existed between Prestige and Palmer. Thorne's employee status is also presumptively established because Prestige gave Palmer authority to hire other loan officers and processors, such as Thorne, to assist him with loan origination *subject to Lewis' final approval.* (Lewis

Aff. ¶ 6) (emphasis added.) Moreover, Thorne conceded that he was "employed with . . . Prestige" at the time of the Stith transaction. (BAMC's Mem., Ex. J ("Thorne Aff.") ¶ 1.)

■ Nonetheless, Prestige argues that Palmer and Thorne were independent contractors. An independent contractor is "[a] person who is employed to do a piece of work without restriction as to the means to be employed, and who employs his own labor and undertakes to do the work according to his own ideas, or in accordance with plans furnished by the person for whom the work is done, to whom the owner looks only for results." *Atkinson v. Sachno*, 261 Va. 278, 541 S.E.2d 902, 905 (2001) (quoting *Epperson v. De Jarnette*, 164 Va. 482, 180 S.E. 412, 413 (1935)). "Whether a person is an independent contractor or an employee is generally a question of fact for a jury; however, when the evidence admits of but one conclusion, the question is one of law." *Atkinson*, 541 S.E.2d at 905 (internal quotation marks and citation omitted).

■ Four factors are to be considered in determining whether a person is an employee or independent contractor: (1) selection and engagement; (2) payment of compensation; (3) power of dismissal; and (4) power to control the means and methods of the work performed by the individual. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative. *See Hadeed v. Medic–24, Ltd.*, 237 Va. 277, 377 S.E.2d 589, 594–95 (1989) (citations omitted). However, the employer need not actually exercise this control; the test is whether the employer has the *power* to exercise such control. *McDonald v. Hampton Training Sch. for Nurses*, 254 Va. 79, 486 S.E.2d 299, 301 (1997) (citation omitted and emphasis added). Prestige contends that Palmer, who

was delegated the authority to hire Thorne, was also given virtually unqualified control over the manner in which he and his staff originated business on Prestige's behalf. (Prestige's Mem. at unnumbered page 9.) Furthermore, Prestige did not set forth guidelines as to how Palmer and his staff were to meet their loan origination goals or otherwise service loan applicants. (*Id.*)

■ Stith relies heavily on the fact that Lewis conceded that he hired Palmer to originate loans for Prestige, and that he also authorized Palmer to hire loan officers (such as Thorne) to assist him. (Pl.'s Opp'n to Prestige's Mot. Summ. J. ("Pl.'s Opp'n to Prestige") at 6) (docket entry no. 83.) Lewis also retained final approval over all person Palmer hired. (*Id.; see also* Lewis Aff. ¶ 6.) Just as the right to assign a contract of employment *without* the consent of the other contracting party is a right that signifies the status of an independent contractor, *see Texas Co. v. Zeigler*, 177 Va. 557, 14 S.E.2d 704, 707 (1941), the opposite likewise assists in demonstrating the existence of an employer-employee relationship in situations where the right to assign a contract of employment requires the consent of the employer, here Prestige. Again, Lewis attested to his authority as the ultimate decision-maker for purposes of approving those persons Palmer chose to hire to facilitate Prestige's performance of loan origination services. Construing the facts in the light most favorable to the non-moving party, in this case Stith, a reasonable factfinder could conclude that Lewis' final decision-making authority included the power to discharge persons Palmer had hired if Lewis ultimately concluded that the particular individual was performing unsatisfactorily or otherwise not in accordance with Lewis' expectations. The instruction to fire this individual, if given,

would have required Palmer's accession. "One of the means of ascertaining whether or not" the right to control exists, and thus whether or not the status of an employee or independent contractor exists, "is the determination of whether or not, if instructions were given, they would have to be obeyed." *Id.* Lewis, as president of Prestige, retained the ultimate right to control both Palmer and Thorne, and this fact supports their employee status.

The fact that Prestige did not monitor its employees' behavior, and did not establish guidelines for how the employees were to "meet their loan origination goals or otherwise service loan applicants" (Prestige's Mem. at unnumbered page 9), even though it had the power to do so, could justify assigning responsibility and liability to Prestige, rather than eliminating it. Additionally, Prestige compensated Palmer and Thorne in the form of commissions earned for any loans they originated on Prestige's behalf. And, of course, in his opinion, Thorne felt that he was Prestige's employee throughout the Stith transaction. "It is only by consideration of all the facts pertaining to the relationship in any case, including the provisions of the contract, the actual conduct of the parties, and the conditions of the business in which they are engaged, that it can be determined whether the individual is endowed with that control over his own methods and means of doing the work which is the test of the independent contractor." *Atkinson,* 541 S.E.2d at 906 (citing *The Texas Co.,* 14 S.E.2d at 708).

Given such precepts, the Court concludes that Stith has made a *prima facie* showing of an employment relationship between Prestige, Palmer, and Thorne. Therefore, the remaining issue in need of resolution is whether Prestige has provided undisputed material evidence that successfully demonstrates—as a matter of law—that Palmer and Thorne's actions were committed outside the scope of the employment relationship.

### ii. If Palmer and Thorne Were Employees of Prestige, Did They Act Outside the Scope of Their Employment in Providing Services to the Plaintiff?

Even assuming that Palmer and Thorne were employees of Prestige, it is argued that their actions involving Stith were committed outside the scope of their employment with Prestige. To prevail on summary judgment, then, Prestige must show there is no genuine issue of material fact "that the employee[s] had departed from the scope of the employment relationship at the time the injurious act was committed." *Majorana,* 539 S.E.2d at 429. In ruling on the Defendants' motions to dismiss, the trial court noted that "Thorne and Palmer's actions were not so clearly a deviation from the scope of their employment with Prestige as to warrant a dismissal for failure to state a claim." *Stith v. Thorne,* 2006 U.S. Dist. LEXIS 80192, at *3 (E.D.Va. Oct. 30, 2006) (Hudson, J.), *adopting,* 2006 U.S. Dist. LEXIS 80191 (E.D.Va. Sept. 19, 2006). Here, however, the Court is not faced with a Rule 12(b)(6)motion to dismiss that is restricted to evaluating the strength of the allegations in the Complaint but, rather, a motion for summary judgment pursuant to Fed.R.Civ.P. 56. Rule 56(c) allows the Court to consider various matters outside of the pleadings which Prestige may utilize in attempting to successfully rebut the presumption of vicarious liability.

█ The doctrine of *respondeat superior* will apply only when the "employee was performing the employer's business and acting within the scope of the employment when the tortious acts were committed." *Giant of Md., Inc. v. Enger,* 257 Va. 513, 515 S.E.2d 111, 112 (1999) (citations

omitted). "Generally, the inferences to be drawn from the established facts are within the province of a jury." *Id.*

The test of the liability of the master for the tortious act of the servant, is not whether the tortious act itself is a transaction within the ordinary course of the business of the master, or within the scope of the servant's authority, but whether the service itself, in which the tortious act was done, was within the ordinary course of such business or within the scope of such authority.

*Id.* (quoting *Davis v. Merrill,* 133 Va. 69, 112 S.E. 628, 631 (1922)).

█ Was the scheme allowing Stith to rent another person's good credit by temporarily giving up title to her home, and then receiving a refinanced loan after she improved her credit by working with a credit repair company, so far outside the scope of a mortgage broker's employment so as to conclude that Prestige cannot be held—as a matter of law—liable for the actions of its employees, Palmer and Thorne? Such is necessarily an issue for a jury to resolve.

Palmer and Thorne's objectives, as defined by its president Lewis, were to serve as mortgage brokers and provide "loan origination services." (Lewis Aff. ¶ 4.) A mortgage broker is one who markets mortgage loans and brings lenders and borrowers together. *Black's Law Dictionary* 206 (8th ed.2004); 24 C.F.R. § 3500.2 (2006) (defining "mortgage broker"). In connection with a prospective settlement, mortgage brokers can be authorized, as was the case here, to provide the service of originating a mortgage loan. 24 C.F.R. § 3500.2 (a "mortgage broker," *inter alia,* renders "settlement services" which include origination of mortgage loans, and other loan processing and origination services). A jury could conclude that such services, even when committed improperly, were

necessary to lure Stith into the Defendants' elaborate predatory lending scheme. Thorne admitted in his affidavit that part of his underlying purpose behind the transaction was to "use Prestige's brokerage services to secure a loan for Ms. Stith in furtherance of her efforts to buy back her house from Friday." (Thorne Aff. ¶ 6.) Prestige also collected a loan closing fee of $1,514.00 upon execution of the settlement, and the Court cannot conclude as a matter of law that an act is committed outside the scope of employment when an employee is making money for, and the employer is knowingly accepting, such funds. The degree of supervision Prestige exercised, or failed to exercise, in regard to its employees would allow a jury to infer its negligence in permitting its employees to commit the alleged wrongful acts. Prestige entered into an employment contract with Palmer, and Prestige gave Palmer the authority to hire people to work for it. Virginia courts maintain a broad view of the scope of employment, and hold that even intentional torts may be within the scope of employment. *Gutierrez de Martinez v. Drug Enforcement Admin.,* 111 F.3d 1148, 1156 (4th Cir.1997) (applying Virginia law and citing cases therein), and the issue is more appropriate for a jury to decide.

The courts ... have long since departed from the rule of non-liability of an employer for wilful or malicious acts of his employee. Under the modern view, the wilfulness or wrongful motive which moves an employee to commit an act which causes injury to a third person does not of itself excuse the employer's liability therefor. The test of liability is not the motive of the employee in committing the act complained of, but whether that act was within the scope of the duties of employment and in the

execution of the service for which he was engaged.

*Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.,* 249 Va. 39, 453 S.E.2d 261, 266 (1995) (quoting *Tri–State Coach Corp. v. Walsh,* 188 Va. 299, 49 S.E.2d 363, 366 (1948)). Applying the test in *Commercial Business Systems,* the Supreme Court of Virginia observed:

> Unquestionably, Waldrop's conduct was outrageous and violative of his employer's rules. His motive was personal—to advance his self-interest, rather than the interest of Bellsouth. And yet, Waldrop's willful and malicious acts were committed while Waldrop was performing his duties as Bellsouth's contract negotiator and administrator and in the execution of the services for which he was employed.
>
> We hold, therefore, that the evidence presents a jury issue whether Waldrop acted within the scope of his employment when he committed the wrongful acts.

*Commercial Bus. Sys., Inc.,* 453 S.E.2d at 266.

Like *Commercial Business Systems,* though Palmer and Thorne's conduct was likely violative of Prestige's internal rules, and undoubtedly motivated by a desire to further their own self-interests rather than that of their employer, a reasonable juror could conclude that the acts were nonetheless committed while performing their roles as mortgage brokers. *See, e.g., Plummer v. Center Psychiatrists, Ltd.,* 252 Va. 233, 476 S.E.2d 172 (1996) (trial court erred by holding, as a matter of law, that a psychologist who had sexual intercourse with a patient was acting outside the scope of his employment; thus, *respondeat superior* was applicable); *Tri–State Coach Corp.,* 49 S.E.2d at 366 (after altercation between motorist and bus driver, bus driver stopped the bus, left his vehicle, and

struck the plaintiff motorist in the face. Held: the bus company was liable because the driver was acting within the scope of his employment when he struck the motorist); *Davis,* 112 S.E. at 631 (railroad gateman did not act outside the scope of his employment when, after becoming agitated at a motorist who asked him to raise the gate, he shot at the vehicle and killed one of its occupants). Indeed, even "a 'forbidden' or 'consciously criminal or tortious' act may still be within the scope of employment." *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1351 (4th Cir.1995) (applying Virginia law) (citing Restatement (Second) of Agency §§ 230, 231, 235–36 and *Tri–State Coach Corp.,* 49 S.E.2d at 367).

Here, Palmer and Thorne were providing loan origination services to Stith when the allegedly wrongful acts occurred. Thus, given relevant Virginia law, the issue as to whether their acts were committed within the scope of their employment must be resolved by a jury.

## 4. Plaintiff Stith's Motion for Summary Judgment Against Defendant Southern Central Title (SCT) on the RESPA and WSA Claims

### A. *Facts Relevant to Stith's Motion*

As noted previously, SCT was to provide settlement services to Stith, and Stith alleges that SCT provided these services as a necessary part of the predatory lending scheme. (Compl.¶ 58.) When Stith arrived at SCT, she was greeted by both Thorne and Linari (an employee of SCT). (Pl.'s Mot. Summ. J. ("Pl.'s Mot.") at 2, ¶¶ 1–3 (docket entry no. 76).) Stith's expectation was that she would be signing documents to obtain a loan. (*Id.* ¶ 1.) After signing the documents, she requested copies for her personal records, but Thorne only provided her with "simply

blank white sheets of paper." (*Id.* ¶¶ 5–7.) Stith thus claims that she never received a copy of the Settlement Statement (the HUD–1) on which Linari signed Stith's name pursuant to a Power of Attorney. (*Id.* ¶ 8.) The Settlement Statement conclusively demonstrates that Linari signed on behalf of Stith pursuant to the Power of Attorney. (Compl., Ex. F.) The Power of Attorney was to apply to all documents necessary "for the consummation for the refinance of" Stith's home, and "for the consummation of the real estate transaction for the purchase and settlement of the property." (Compl. ¶ 37 & Ex. G.) It specifically authorized Linari to be Stith's attorney-in-fact for such transactions. Pursuant to the Settlement Statement, SCT issued Thorne a check for $55,640.76 (*id.*, Ex. H), even though the Forfeit of Proceeds document (*id.*, Ex. O) did not specify how much money Thorne was supposed to receive. Nevertheless, the Forfeit of Proceeds Document indicated that Stith wanted to pay Thorne "for services rendered" at the "closing of the property."

Stith alleges that Linari and SCT never performed a closing that refinanced Stith's loan. (Pl.'s Mot. at 3, ¶ 15.) Linari and SCT did, however, perform a closing in which Friday received the deed to Stith's property (on the basis of which Friday is now attempting to evict Stith), and BAMC received a deed of trust on the property to secure payment of the loans that were extended. (*Id.* ¶ 16.)

Stith claims that, "On behalf of [SCT], [ ] Linari had a pre-existing arrangement with [ ] Thorne pursuant to which [SCT] would calculate and then give to [ ] Thorne all of a person's equity in his or her home if" a Power of Attorney were provided. (*Id.* ¶ 18) (citing Pl.'s Mot., Ex. F ("Linari Dep.") 103:9–104:12; 118:14–120:2.) Pursuant to such an arrangement, "Thorne had informed [SCT] and [ ] Linari that the money would be used to pay debts of the person in the future to help improve the person's credit and that the person would have the opportunity to then obtain a loan on the house in the future." (Pl.'s Mot. at 4, ¶ 19.) As noted earlier, of the $55,640.76 SCT paid to Thorne, Thorne gave $20,000 to Friday (in two separate $10,000 payments) (Pl.'s Mot., Ex. J ("Friday Dep.") 54:4–19). Payment of $55,956.29 was made on Stith's prior mortgage, while Stith received a payment of $9,500. (Pl.'s Mot. at 4, ¶ 25.)

### B. *Analysis*

Essentially, Stith argues that the entire transaction between her and SCT was unlawful and violates pertinent provisions of both RESPA, 12 U.S.C. § 2601 *et seq.*, and the WSA. Her primary argument is premised on the payment from SCT to Thorne ($55,640.76), and then from Thorne to Friday ($20,000). (*See* Pl.'s Mot. at 6.) Ultimately, Stith claims that no factual issue exists that Friday was paid an unlawful $20,000 fee, and thus summary judgment is appropriate with respect to her RESPA and WSA claims against SCT.

### i. *RESPA*

 The Real Estate Settlement Procedures Act of 1974 ("RESPA") was enacted to enable consumers to better understand the home purchase and settlement process and, where possible, to bring about a reduction in settlement costs. *See* 12 U.S.C. § 2601 (2000); *McAnaney v. Astoria Fin. Corp.*, 357 F.Supp.2d 578, 588 (E.D.N.Y.2005). One of the abusive practices that Congress sought to eliminate through the enactment of RESPA was the payment of referral fees, kickbacks, and other unearned fees. S.Rep. No. 93–866 (1974), *reprinted in*, 1974 U.S.C.C.A.N. 6546, 6551. Of particular interest to Congress was the payment by settlement service providers of commissions or fees in

exchange for the referral of a consumer's business. *Id.* Congress similarly wished to eliminate fees for which no service was performed and no goods were furnished. *Id.* Such fees are passed along to consumers and increase settlement costs without providing any benefits. The activity undoubtedly motivated Congress' enactment of Section 2607 of RESPA which provides, in pertinent part:

> (a) Business referrals. No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.
> (b) Splitting charges. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(a)-(b) (2000); *see also* 24 C.F.R. § 3500.14(b)-(c) (2006). Thus, Subsection (a) generally prohibits awarding fees or kickbacks pursuant to any referral fee arrangement,[10] and subsection (b) attempts to otherwise prohibit any person from giving or accepting any part of a fee unless services were actually performed. The Department of Housing and Urban Development ("HUD") is the administrative agency charged with enforcing RESPA and furthering its goals; it is

authorized by statute to prescribe rules and regulations, and to make interpretations of RESPA. 12 U.S.C. § 2617(a) (2000). HUD has issued regulations pursuant to this authority, commonly referred to as "Regulation X," 24 C.F.R. § 3500.1 *et seq.* (2006). RESPA provides a private right of action against violators of Section 2607. *See* 12 U.S.C. § 2607(d) (2000).

The Fourth Circuit has clarified the relationship between the business referral and splitting charges provisions of RESPA:

> The provisions both seek to eliminate kickbacks or referral fees paid to a third party, but they do so by prohibiting different actions. [Section 2607(a) ] prohibits the payment of formal kickbacks or fees for the referral of business and does not require an overcharge to a customer. On the other hand, [Section 2607(b) ] "prohibits splitting fees with anyone for anything other than services actually performed." *Willis v. Quality Mortgage USA, Inc.,* 5 F.Supp.2d 1306, 1308 (M.D.Ala.1998) (noting the differences between [Section 2607(a) ] and (b)). Section [2607(b) ] therefore requires an overcharge and prohibits conduct where money is moving in the same way as a kickback or referral fee even though there is no explicit referral agreement.

*Boulware v. Crossland Mortgage Corp.,* 291 F.3d 261, 266 (4th Cir.2002) (Wilkin-

---

10. The "agreement or understanding" required by Section 2607(a) "need not be written or verbalized but may be established by a practice, pattern or course of conduct." 24 C.F.R. § 3500.14(e) (2006). "When a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the refer-

ral of business." *Id.* Although there is evidence of multiple transactions in which the same parties participated, including Thorne and Friday, the fact that they played the same role in repeated transactions does not present a disputed material fact that SCT was on notice that the monies paid were connected in any way with the volume of value of the business referred pursuant to an agreement or understanding for the referral of business.

son, C.J.). In *Boulware*, the Fourth Circuit held that although Section 2607(b) clearly prohibits kickbacks, it "only prohibits overcharges when a 'portion' or 'percentage' of the overcharge is kicked back to or 'split' with a third party." 291 F.3d at 265. Thus, "the presence of an overcharge alone ... is not sufficient to fall within the purview of [Section 2607(b)]." *Id.* n. 3.

Stith argues that Thorne's $20,000 payment to Friday is an unlawful kickback or referral fee prohibited by RESPA. As she views it:

"Although the overall agreement between the parties is not written down, no one disputes that Roscoe Friday was paid $20,000.00 for his role in the transaction, and that this money came out of the loan proceeds given by [SCT] to Fabian Thorne. In its pre-existing agreement with Fabian Thorne, [SCT] expected that Thorne would use the money to pay future creditors of Mrs. Stith and given [sic] her opportunity to obtain a new loan on the property. [SCT] thus paid Thorne $55,640.76 pursuant to this unwritten agreement and without asking for any documentation regarding who was paid. It knew that Thorne was a mortgage broker with Prestige Mortgage and that he would be overseeing how this $55,640.76 was spent."

(Pl.'s Mot. at 13.) Moreover, Stith asserts: "As a purchaser who was 'renting his credit,' [Friday's] services were incident to the transaction but they were not earned. On the contrary, he would only receive his fee for 'renting his credit' if the transaction were handled through Prestige Mortgage and overseen by Fabian Thorne. He was not actually paid for 'renting his credit' because such a transaction does not actually exist; on the contrary he was paid so that this

entire transaction could be run through Prestige Mortgage. As such, his fee was a prohibited fee under § 2607(a) of RESPA ...."

(*Id.* at 14.) Finally, Stith argues in the alternative that "[i]f the Court does not determine that this fee was a referral fee in violation of" Section 2607(a), "then the only type of fee it can be is an unearned kickback under [Section] 2607(b) of RESPA." (*Id.*)

With respect to Section 2607, the Fourth Circuit has interpreted the phrase "No person shall given and no person shall accept" as prohibiting one activity, in which one party gives and one party accepts a fee. The situation described is essentially a "kickback" where, for example, a settlement service provider arranges for a consumer to use the services of a third party vendor and that vendor then shares a portion of the amount charged to the consumer with the settlement service provider. *See Boulware*, 291 F.3d at 266 ("The use of the conjunctive 'and' indicates that Congress was clearly aiming at an exchange or transaction, not a unilateral act.").

It is undisputed that Thorne told Linari (an SCT employee) that he was to receive the seller's (*i.e.*, Stith's) proceeds from the sale of the home so that he could pay the Plaintiff's bills for a year and repair her credit so she could buy her house back. (Linari Dep. 103:9–104:12; 118:14–120:2.) The HUD–1 reflects this understanding (Compl., Ex. F, line 518), as does the Forfeit of Proceeds document executed by Stith indicating that Thorne was to be paid "for services rendered ... at the closing of the property" (*id.*, Ex. O). But there is no evidence that Thorne told Linari that he would split any of the proceeds with Friday. (*See* Linari Aff. ¶ 4; *see also* SCT's Resp., Ex. 6, Linari Dep. 110:11–21.) Nor is there evidence that Friday conveyed to

SCT knowledge of his anticipated "kickback," and there are no facts demonstrating that SCT even had knowledge of Thorne's $20,000 payment to Friday. (Linari Aff. ¶¶ 5–6.) Friday testified in deposition that he never informed SCT of any agreement he had with Stith or Thorne, or in what manner he was expecting to be compensated. (Friday Dep. 67:13–21; 102:11–19.) Moreover, even if there was a material dispute as to evidence of an "agreement or understanding," there is no dispute in the evidence that any purported kickback was made "for the referral of business" to SCT. *See Boulware,* 291 F.3d at 266; *see also United States v. Gannon,* 684 F.2d 433, 436–37 (7th Cir.1981) (*en banc* ) (to come within the scope of Section 2607(a)'s prohibitions, there must be an agreement or understanding pursuant to which the payor and the recipient of the thing of value understand that the payment is in return *for the referral of business* ). Thus, there is no evidence that SCT had knowledge of, or ever agreed to, the wrongful "fee, kickback, or thing of value ... that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). Without evidence of such "agreement or understanding" of the wrongful payment made by Thorne to Friday, be it actual or intended, SCT cannot be held liable for providing a business referral fee prohibited by RESPA.

SCT offers additional arguments. SCT argues that Stith has not alleged that the payment by Thorne to Friday constituted a fee in connection with settlement services in a "federally related mortgage loan," *see* 12 U.S.C. §§ 2602, –2607, or that SCT or Linari gave or accepted any charge fee for rendering real estate "settlement services" in connection with a transaction involving a federally related mortgage loan other than for services ac-

tually performed, *see id.* (SCT's Resp. at 7.) However, it is not necessary to address these additional issues where the Court concludes there was no violation of RESPA for the reasons stated already.

Nor do the facts indicate that SCT violated Section 2607(b). "The statutory language describes a situation in which *A* charges *B* (the borrower or seller) a fee of some sort, collects it, and then either splits it with *C* or gives *C* a portion or percentage (other than 50 percent—the situation that the statutory term 'split' most naturally describes) of it." *Krzalic v. Republic Title Co.,* 314 F.3d 875, 879 (7th Cir.2002) (Posner, J.). Section 2607(b) therefore targets only the division of charges where the giver (here asserted to be SCT) is involved in rendering a "real estate settlement service" and the acceptor (here asserted to be Thorne) gets paid "other than for services actually performed." *Durr v. Intercounty Title Co.,* 826 F.Supp. 259, 262 (N.D.Ill. 1993), *aff'd,* 14 F.3d 1183 (7th Cir.1994). Here, SCT did not give or share a "portion, split, or percentage of any charge" with anyone, and thus liability under this subsection does not attach.

### ii. The WSA

The WSA tracks the purposes behind RESPA. Indeed, under the WSA, no lay settlement agent incident to any real estate settlement or sale "shall pay or receive, directly or indirectly, any kickback, rebate, commission, thing of value, or other payment pursuant to any agreement or understanding, oral or otherwise, that business incident to services required to complete a settlement be referred to any person." Va.Code Ann. § 6.1–2.13:1(A). Thus, under the WSA, a settlement agent is liable if he pays to a third party any prohibited kickback pursuant to an agreement or understanding between the settlement agent and a third party, even if the

payment is made indirectly. Under this reasoning, Stith argues that there can be no genuine dispute that the payments to Friday were either unlawful referral fees or unlawful kickbacks in violation of the WSA. (Pl.'s Mot. at 14.) In Stith's view, SCT had to expect that Thorne would use the money given by SCT to pay future creditors of Stith in order to provide her with the opportunity to obtain a new loan on the property. (*Id.*)

SCT, on the other hand, argues that the payment to Friday was made *after* the closing was handled by SCT and that, as a result, SCT had no knowledge of the $20,000 payment. (SCT's Resp. to Pl.'s Partial Mot. Summ. J. ("SCT's Resp.") at 2 (docket entry no. 80.)) Predictably, Linari claims to be an innocent pawn in Thorne's elaborate scheme by insisting that Thorne only told her he would receive the proceeds from the sale of the home so that he could pay Stith's bills for a year and repair her credit in order for her to buy back her house. (*Id.*) (citing Linari Aff. ¶ 4.) She states that Thorne never told her that some of the proceeds would be paid to another person. (*Id.*) Nor did Friday tell SCT or Linari about any agreement he allegedly had with Stith, or in what manner, if at all, Friday was to be compensated. (*Id.* ¶¶ 5–6.) In sum, there is no evidence that SCT paid any sum to anyone "pursuant to any agreement or understanding ... that business incident to services required to complete a settlement be referred to any person." Va.Code Ann. § 6.1–2.13:1(A). As the Court has concluded with respect to the RESPA claim, even though there is evidence of SCT knowing that Thorne intended to pay off

Stith's creditors, there is no evidence that SCT was ever aware of Thorne's payment, whether actual or intended, to Friday. Nor is there evidence that the payment to Thorne was in response to Thorne's referring business to SCT. Thus, summary judgment is appropriate for SCT on the Plaintiff's WSA claim.[11]

Finally, Stith complains she never received a copy of the HUD–1 Settlement Statement. According to Regulation X, at or before closing, the borrower (Friday), seller (Stith), and lender each must receive a copy of the HUD–1 form. 24 C.F.R. § 3500.10(b). Again, one goal of RESPA is to provide "more effective advance disclosure to home buyers and sellers of settlement costs." 12 U.S.C. § 2601(b)(1). HUD–1s are a key part of this disclosure process; they must be provided at or a day before settlement and must succinctly explain to a home buyer and seller the charges and fees that will be incurred in the transaction. *Id.* § 2603(a) (all charges imposed on the buyer and seller in connection with the settlement must be "conspicuously and clearly itemize[d]"); 24 C.F.R. § 3500.8. The HUD–1 form reflects a policy concern of Congress, as implemented through HUD, to render the financial side of a home sale transaction understandable to all parties, and not just the closing experts and lenders. *United States v. Wilkins,* No. 1:06–CR–76–02, 2007 WL 896147, at *7, 2007 U.S. Dist. LEXIS 20633, at * 24–25 (E.D.Tenn. Mar. 22, 2007). However, the courts to have addressed the issue have concluded that Section 2603 does not provide a private cause of action for its violation. *See Morrison v.*

---

11. Regarding the WSA, SCT and Linari assert the argument previously raised by BAMC— that the WSA does not provide a private right of action for violations of Va.Code Ann. § 6.1–2.13:1(A). Having concluded, however, that even if the WSA does provide a private

right of action for violations of Section 6.1–2.13:1(A), the facts do not support a finding of liability for want of SCT's "agreement or understanding" to pay an improper kickback, it is unnecessary to resolve the issue.

*Brookstone Mortg. Co.*, 415 F.Supp.2d 801, 805–06 (S.D.Ohio 2005) (nothing in the language or structure of § 2603 supports the argument that Congress intended to create a private cause of action for violation of this provision); *Reese v. 1st Metro. Mortgage Co.*, No. 03–2185–KHV, 2003 WL 22454658, at *4–5, 2003 U.S. Dist. LEXIS 19256, at *16–17 (D.Kan. Oct. 28, 2003) (same); *Sturm v. Peoples Trust & Sav. Bank,* 713 N.W.2d 1, 2–4 (Iowa 2006). Moreover, although Stith claims she did not receive a copy of the HUD–1, she seeks no remedy for such violation, nor does she cite to case law or an applicable statute (express or implied) that would support any relief.

### V. Conclusion

Significant progress has been made in expanding access to capital for previously under served borrowers. Despite such progress, however, too many low– and moderate–income families have witnessed the dream of home ownership become a nightmare because of predatory or abusive lending practices. Predatory mortgage lending practices strip borrowers of home equity and threaten families with foreclosure, destabilizing the very communities that are beginning to enjoy the fruits of economic success. *See generally* HUD–Treasury Task Force on Predatory Lending, *Curbing Predatory Home Mortgage Lending* 1–2, 13 (June 2000), *available at* http://www.hud.gov/library/bookshelf12/pressrel/treasrpt.pdf (last visited May 29, 2007). At its core, predatory lending involves engaging in deception or fraud, manipulating borrowers or sellers through aggressive sales tactics, or taking unfair advantage of a borrower's or seller's lack of understanding about loan terms. Predatory lending usually occurs in the sub-

prime mortgage market,[12] where most borrowers use the collateral in their homes for debt consolidation or other consumer credit purposes. *Id.* at 1.

The undisputed facts of this case illustrate the dangers that may befall consumers by their falling prey to predatory selling and lending schemes. Such schemes are at their worst when clever, seasoned veterans of the mortgage lending industry seek to take advantage of unsophisticated victims in financially vulnerable positions by making unrealistic promises and exploiting the victims' weaknesses. Here, the evidence that has been offered would allow a reasonable trier of fact to conclude that Thorne, Palmer, Essex, and Friday were engaged in an elaborate conspiracy that eventually caused the Plaintiff, an individual so financially vulnerable that she contemplated seeking bankruptcy protection, to lose title to her home and be served with an eviction notice. To execute their scheme, however, these Defendants used other unwitting parties to provide the necessary funding (BAMC), to lull the Plaintiff into a false sense of security with the promise of a new financial life (ACS), and to facilitate the entire scheme by providing the requisite documentation that gave the transaction its "legal" appearance (SCT and Linari). Others (Prestige) also apparently became unwitting parties to their employees' (Palmer and Thorne) wrongful and illegal conduct that may have been committed within the scope of their employment. The actions of the Defendants resulted in Thorne's being paid over $55,000 in cash for his role in the transaction, with $20,000 of that being provided to Friday for performing his "services." And, all the while, the Plaintiff never realized the benefits promised to her.

Nonetheless, there is no evidence that the parties used by the ringleaders know-

---

**12.** Sub-prime lending refers to lending to persons who, because of poor credit history, have

been historically excluded from obtaining credit.

ingly or consciously participated in the predatory lending scheme. Indeed, there is nothing beyond mere conclusory allegations and categorical assumptions that Defendants BAMC, SCT, Linari, Lehman Bank, and the Successors in any way knowingly agreed to participate in the illegal conspiracy, at least for purposes of establishing a violation of RESPA or the WSA. The Plaintiff, therefore, has not met her burden in rebutting the undisputed evidence and the Defendants' arguments for summary judgment.

However, numerous claims are still pending against certain of the Defendants that were not resolved by the parties' summary judgment motions, namely, alleged violations of: the ECOA and FCRA against Prestige (Counts I and II); the CROA against ACS and Prestige (Count IV); the Virginia Credit Services Business Act, Va.Code Ann. § 59.1–335.1 *et seq.*, against ACS and Prestige (Count V); the Virginia Consumer Protection Act, Va. Code Ann. § 59.1–200(A), against ACS, SCT, and Prestige (Count VI); common law fraud against ACS, Prestige, Thorne, Palmer, SCT, and Linari (Count VII); and common law conspiracy against Thorne, Essex, Palmer, Friday, Linari, Prestige, ACS, and SCT (Count VIII). Those issues must be resolved by the factfinder as concerns the Defendants that are not in default.

For the foregoing reasons BAMC, Lehman Bank, and the Successors' motions for summary judgment are GRANTED; SCT's motion is GRANTED with respect to the RESPA and WSA counts of the Plaintiff's Complaint (Counts III and IX); Prestige's motion is DENIED; as is the Plaintiff's cross-motion against SCT.

An appropriate Order shall issue.